**Doris FLEMING, Plaintiff,**

v.

**The SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, Defendant.**

**Civil Action No. 6:95–3248–20AK.**

District Court of United States
D. South Carolina,
Greenville Division.

Dec. 17, 1996.

Order Denying Reconsideration
Jan. 9, 1997.

Edwin L. Turnage, Esq., Travelers Rest, SC, Suzanne E. Coe, Esq., Greenville, SC, for plaintiff.

Susan Eglin Sykes, Esq., Vance E. Drawdy, Esq., Haynsworth, Baldwin, Johnson & Greaves, Greenville, SC, for defendant.

### ORDER

CATOE, United States Magistrate Judge.

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff alleges that the defendant retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*[1]

For reasons set forth below, the defendant's motion should be denied.

### FACTS PRESENTED

The plaintiff, Doris Fleming, began working for the defendant, the South Carolina Department of Corrections ("SCDC"), at Perry Correctional Institution in October 1988 (Fleming dep., def. ex. A, at 20, 25, 30). The plaintiff was assigned to the position of correctional officer in the medium-security component of Perry, commonly referred to as "the yard" (Fleming dep. at 30–31). In October 1990, she was assigned to the position of medium-security operations officer, a permanent post. Although the plaintiff worked at different post assignments, she remained in medium security until 1993 (Fleming dep. at 43). On March 13, 1992, at the request of the captain of medium security, James Sewell, the plaintiff was transferred to the disciplinary office and placed in another permanent post assignment. The plaintiff alleges that throughout her assignment in medium security, she was subjected to sexual advances by Sewell. Sewell would visit her post assignment and attempt to engage her in a sexual relationship. The plaintiff testified that he would say things such as, "if I ever had him, I wouldn't want a black man again." While the plaintiff worked under his direct supervision, Sewell made comments such as "come in here and get naked" and "spread your legs," and asked if she was "ever going to do it with him" (Fleming dep. at 159–167). In November 1992, the plaintiff

---

1. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 19.02(b)(2)(F) D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

adamantly refused Sewell's request for sex, and in December 1992 or January 1993, the plaintiff was transferred to work posts in the Yard (Fleming dep. at 77).

In mid-April 1993, the plaintiff filed a written complaint of sexual harassment against Sewell.[2] In compliance with SCDC policy, the plaintiff was transferred to maximum security, commonly referred to as "the hill" (Fleming dep. at 176). In maximum security, the plaintiff was under the supervision of Captain Jurell Byrd (Fleming dep. at 188).

The defendant performed an internal investigation of the plaintiff's allegations and concluded that the plaintiff did not have enough information to substantiate her claim of sexual harassment (Fleming dep. at 184).

The plaintiff alleges that during the investigation and after it was completed, her new supervisors in maximum security made her job difficult (Fleming dep. at 189; Second Am.Compl. ¶ 13). The plaintiff alleges that, shortly after her assignment to D Dorm on the hill, a series of events took place that placed her safety at risk and interfered with her ability to do her job. In April 1993, the plaintiff was transferred by Lieutenant Kearney, her immediate supervisor, an abnormally high number of times between the prisoner dorms. The plaintiff also alleges several incidents that occurred involving prisoners which were not handled appropriately. On separate occasions in October and December of 1993, the plaintiff, who worked first shift from 8:00 a.m. to 4:00 p.m., was involuntarily left on her post for 16 hours without warning or an explanation. In March 1994, the defendant refused to pay the plaintiff for her overtime hours, and in April 1994 the plaintiff's Saturdays and Sundays off were taken and given to a more junior officer.

In June 1993, the plaintiff injured her back while at work and periodically missed work as the result of her injury (Fleming dep. at 205). In November 1993, the plaintiff began to receive counseling and medicinal treatment for stress, first from a counselor whose

services were provided through the SCDC's employee assistance program, and later from a psychiatrist (Fleming dep. at 211–214). In April 1994, the plaintiff took a paid leave of absence as the result of stress. When the plaintiff returned to work, she was placed back in medium security.[3] The plaintiff testified that she was afraid to go in the yard area of medium security upon her return to work. She took an additional leave of absence until September 1994. She resigned from Perry Correctional Institution on September 12, 1994 (Fleming dep. at 222).

### APPLICABLE LAW AND CONCLUSIONS

Summary judgment should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). The burden is on the moving party to show that there is "no genuine issue as to any material fact" and that he is "entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, the evidence must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

In order to establish that a genuine issue of material fact exists, the plaintiff must show that there is evidence upon which a finder of fact can reasonably hold in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Id.* at 252, 106 S.Ct. at 2512. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). "Only disputes over facts that might affect the outcome of the

---

2. This complaint was filed shortly after Sewell gave the plaintiff a "meets" evaluation, which was a lower rating than the "exceeds" she had received during previous evaluation periods (pl. mem. at 5).

3. While the plaintiff was on leave, Sewell was transferred to maximum security, necessitating the plaintiff's transfer to medium security.

suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

�— Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Act prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an employment practice made unlawful under Title VII. *See* 42 U.S.C. § 2000e–3(a). The employee's underlying discrimination claim does not have to be meritorious, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n. 1 (4th Cir.1985), and it is not required that the employee have instituted formal proceedings under Title VII to invoke the protection of Title VII's retaliation provision; informal complaints to the employer will suffice. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981).

The plaintiff alleges that she was retaliated against because she engaged in protected activity by rejecting Sewell's advances and filing a sexual harassment claim. She alleges that the retaliation consisted of the following: her transfer in January 1993 from a permanent post assignment in the disciplinary office to the yard; reception of a lower "meets" evaluation; and being subjected to a hostile and abusive working environment.

To establish a *prima facie* case of retaliation, the plaintiff must prove:

(1) she engaged in protected activity;

(2) the defendant took adverse employment action against her; and

(3) a causal connection exists between the protected activity and the adverse action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989).

Once the *prima facie* case is established, the defendant must produce a legitimate, nonretaliatory reason for the adverse action. If the employer articulates a legitimate, nondiscriminatory reason for the conduct, then the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). According to the Supreme Court in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993), "[A] reason cannot be proven to be a 'pretext for discrimination,' unless it is shown both that the reason was false, and that discrimination [retaliation] was the real reason." *Id.* at 512, 113 S.Ct. at 2750.

### Protected Activity

�— The defendant acknowledges that the plaintiff engaged in protected activity when she filed a claim for sexual harassment (def. mem. at 12, n. 7). However, the defendant argues that the transfer and "meets" evaluation occurred prior to the filing of the claim and, therefore, the plaintiff has failed to satisfy the requirements of Section 704(a) of Title VII which provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants ... because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter. 42 U.S.C. § 2000e–3(a) (1994).

The defendant maintains that refusal to submit to a supervisor's sexual advances is not opposition under Section 704(a) (def. reply mem. at 2).[4]

---

**4.** The defendant cites *Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir.1981), as support for its contention. *Armstrong* does not specifically exclude opposition to a supervisor's sexual advances as "opposition" to unlawful practices. It

merely explains that to fall under the protection of 704(a), the protected activity need not rise to the level of formal charges of discrimination and may include conduct such as voicing complaints to employers or using an employer's grievance

Several district courts have determined that opposition to unlawful employment practices under 42 U.S.C. § 2000e–3 encompasses a person's refusal of sexual advances. *Armbruster v. Epstein*, 1996 WL 289991, at 3 (E.D.Pa. May 31, 1996) (court denied defendant's motion to dismiss finding that protected activity includes employee's refusal of sexual advances by employer); *Burrell v. City Univ. of New York*, 894 F.Supp. 750, 761 (S.D.N.Y.1995) (evidence supported finding that "the predominant reason for Burrell's termination was in retaliation either for filing her complaint ... or for refusing to accede to Roman's sexual advances, both activities protected under Title VII"); *Boyd v. James S. Hayes Living Health Care Agency, Inc.*, 671 F.Supp. 1155, 1167 (W.D.Tenn.1987) (plaintiff engaged in protected activity by refusing her supervisor's sexual advances); *EEOC v. Domino's Pizza*, 909 F.Supp. 1529, 1533 (M.D.Fla.1995) (employee ordering supervisor from his office and threatening to file a report after she came onto him was protected activity); *but see, Speer v. Rand*, 1996 WL 667810, at 8 n. 4 (N.D.Ill. Nov. 15, 1996); *Del Castillo v. Pathmark Stores*, 941 F.Supp. 437, 438–439 (S.D.N.Y.1996). Sewell's alleged conduct of requesting sex from the plaintiff is an unlawful practice and the plaintiff's refusal is opposition to such unlawful conduct. This court finds that an employer cannot retaliate against an employee for engaging in protected activity, which includes an employee's refusal of the sexual advances of a supervisor or employer. Therefore, there is sufficient evidence for a jury to conclude that the plaintiff has engaged in protected activity.

### The Transfer

■ The plaintiff has satisfied the element of protected activity sufficient to survive summary judgment. In addition, a genuine issue of material fact exists as to whether the plaintiff's transfer resulted in an adverse employment action that was causally connected to the protected activity. In November 1992, the plaintiff adamantly refused Sewell's request for sex. In December 1992, she was transferred to work posts in the yard as the result of a dispute which the plaintiff argues was not related to her (Fleming aff.). Testimony on behalf of the defendant indicates that the dispute did involve the plaintiff and two other coworkers (Baldwin dep. at 51–55).

■ The defendant alleges that the transfer did not constitute an adverse employment action because the plaintiff's pay and benefits remained the same and she remained on first shift. However, a material issue exists as to whether the transfer from a permanent post to a non-permanent position at SCDC could be considered an adverse employment action. Courts have found an adverse employment action in transfers to positions of the same pay and rank where the new positions lacked the prestige or other advantages of the former jobs. *See Collins v. Illinois*, 830 F.2d 692, 702 n. 7 (7th Cir.1987), and cases cited therein. "Title VII does not limit adverse job action to strictly monetary considerations ... One does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." *Collins*, 830 F.2d at 702.

The plaintiff testified that permanent positions "are appointed by the Captain ... Once you have that permanent post, unless you really mess up you have that job ... That's the difference between a daily post and a permanent position" (Fleming dep. at 37–38). Further, after the plaintiff's transfer she lost overtime hours that she had obtained in the former position and was denied Saturdays and Sundays off.

■ Such a transfer one month after the plaintiff rejected Sewell's advances is sufficient to indicate a causal connection between the protected activity and the adverse employment action. The discharge of an employee shortly after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation. *Carter v. Ball*, 33 F.3d 450 (4th Cir.1994). This contention is bolstered by

procedures. *Id.* at 448. There is no indication in *Armstrong* that the conduct it describes is an

exhaustive list of protected activity.

the evidence in the record of Sewell's use of his position to transfer individuals that he disliked.

The defendant alleges that it has a legitimate nonretaliatory reason for the transfer, which was that the plaintiff was in conflict with other coworkers. However, there is sufficient evidence to indicate that such a reasoning is pretext and the real reason was retaliation. First, a genuine issue exists as to whether the plaintiff was involved in the events that gave rise to the transfer. The plaintiff alleges that she was not a part of the problem and the dispute involved two coworkers. The defendant argues that Warden Baldwin requested that the plaintiff assist a coworker, but the plaintiff was resistant to doing so. Second, within a month of the plaintiff's refusal to engage in sexual relations with Sewell, she was transferred.

### The Evaluation

■■■ The plaintiff received a lower evaluation a few months after she refused Sewell's advances. A lower job rating may qualify as an adverse employment action. The defendant acknowledged that if all things were equal between the plaintiff and another employee, the "meets" evaluation could cost the plaintiff a promotion (pl. ex. at 51).

A genuine issue of material fact exists as to whether the lower evaluation and the protected activity are causally connected. First, the plaintiff received "exceeds" ratings on her evaluations in the past, and a sudden reduction may have violated SCDC policy. The plaintiff alleges that she was not counseled in conformance with SCDC policy, while Sewell argues that she was counseled several times. Third, there is uncontested testimony that Lieutenant Stephens, the plaintiff's immediate supervisor, was shocked by the evaluation and indicated to Sewell that the evaluation was too low considering the quality of the plaintiff's work (pl. memo. at 5).

The defendant alleges that its legitimate nonretaliatory reasons are that the plaintiff was not performing well and could not keep up with her work; however, an issue exists as to whether Sewell conformed with SCDC policy and counseled the plaintiff prior to the lower evaluation. In addition, the plaintiff's immediate supervisor disagreed with the evaluation and described the plaintiff as one of her best officers (pl. mem. at 5).

### Hostile Work Environment

■■■ The plaintiff argues that being subjected to a hostile work environment constituted retaliation against her for filing a claim of sexual harassment in April 1993. Shortly after filing the complaint, in accordance with the defendant's policy in dealing with sexual harassment complaints, the plaintiff was transferred to maximum security under the supervision of Lieutenant Kearney. The defendant argues that no retaliation took place because as soon as the plaintiff filed the complaint she was transferred away from Sewell. However, the plaintiff argues that the retaliation did not come solely from Sewell, but that other employees and supervisors retaliated against her because she filed a complaint. An issue of fact exists as to whether the plaintiff suffered a hostile work environment in retaliation against her for filing a complaint.

Under Title VII, it is an "unlawful employment practice for an employer ... to discriminate against any individual with respect to ... terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 369–70, 126 L.Ed.2d 295 (1993), the Supreme Court clarified the showing necessary to support a claim of hostile work environment sexual harassment under the "terms and conditions" language in Title VII. The Court reaffirmed its holding that "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* at 21, 114 S.Ct. at 370 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 2404–06, 91 L.Ed.2d 49 (1986) (cit. omitted)).

The Fourth Circuit Court of Appeals requires proof of the following elements to establish a claim of hostile work environment sexual harassment under Title VII:

(1) that the conduct in question was unwelcome;

(2) that the harassment was based on sex;

(3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and

(4) that some basis exists for imputing liability to the "employer." *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *aff'd in pertinent part*, 900 F.2d 27 (4th Cir.1990) (en banc).

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court cautioned that the framework for analysis under Title VII would require tailoring for the particular facts of individual cases. "The facts necessarily will vary in Title VII cases, and the specification ... of the *prima facie* proof required ... is not necessarily applicable in every respect to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. In this case, the plaintiff alleges a retaliatory hostile work environment: the specific actions she complains of were not sufficient to qualify as adverse employment actions, but they were sufficient to alter the conditions of her work environment. This court finds that the *prima facie* case of such a claims consists of the following:

(1) the plaintiff engaged in protected activity;

(2) the plaintiff was subjected to unwelcome harassment;

(3) the unwelcome harassment was causally connected to the plaintiff's protected activity;

(4) the harassment was severe and pervasive; and

(5) a basis exists for imputing liability to the employer.

*See also, Davis v. California Dep't of Corrections*, 1996 WL 271001, at *11 (E.D.Cal. Feb. 23, 1996) (plaintiff must meet following to make a *prima facie* case for retaliatory hostile environment: conduct reflecting retaliatory animus; that is unwelcome to recipient; that subjectively and objectively creates severe and pervasive hostility in the working environment; and imputed liability).

This court has previously concluded that an issue of fact exists as to whether the plaintiff engaged in protected activity. The plaintiff alleges that the harassing conduct took the form of personnel decisions by various supervisors, including the Warden; therefore an issue of fact exists as to whether liability is imputed to the employer. See *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343 (4th Cir.1995).

### Harassing Conduct That Was Severe and Pervasive

The plaintiff refers to several incidents as unwelcome harassment that was severe and pervasive:

1. In April, 1993, the plaintiff was transferred by her immediate supervisor, Lieutenant Kearney, an abnormally high number of times between the prisoner dorms. She alleges, without opposition by the defendant, that "[s]uch transfers are unusual and counterproductive to [the] creation of a relatively safe environment. The Department of Corrections trains its Correctional Officers to learn the personalities of inmates because knowing them facilitates control and overall safety" (pl. mem. at 9) The plaintiff asserts that such transfers placed her at a disadvantage, interfered with her ability to perform her job, and repeatedly put her at an increased risk of harm. The defendant alleges that the SCDC was short on officers and all were treated the same (def. mem. at 24). However, the plaintiff alleges that the other correctional officers were not moved and were assigned permanently to certain dorms (pl. ex. 3). The plaintiff's time records indicate that her supervisor changed eight times between June 21, 1993, to September 13, 1993; six times between October 4, 1993, to November 15, 1993; and seven more times from July 6, 1993, to January 30, 1994 (pl. mem. at 9). The defendant has offered no evidence or testimony to support its argument that other officers were treated in the same manner, as to the frequency of transfers, as the plaintiff.

2. The plaintiff also alleges several incidents involving prisoners which were not handled appropriately. The inmates were not transferred to lock down according to SCDC policy for violent or sexual behavior

towards an officer. Further, one of the written incident reports which documented Lt. Kearney's failure to adhere to the policy was lost or destroyed (pl. ex. at 4).

3. On separate occasions in October and December of 1993, the plaintiff, who worked first shift from 8:00 a.m. to 4:00 p.m., was involuntarily left on her post without warning or an explanation for 16 hours. As to the December incident, she alleges that, despite the SCDC overtime policy, white shirts are scheduled ahead of blue shirts.[5] The white shirts left the facilities. She even yelled for relief, but was ignored. When her relief showed up, the second shift supervisor stated that "they told me you volunteered" (pl. ex. 5).

4. In late October, the plaintiff requested a transfer to Transportation. Her request was granted by Captain Byrd. A week later, however, she was reassigned to the dormitories under Warden Witowski's specific orders. Witowski alleged that she was reassigned because she was driving a vehicle too fast; however, she was not afforded a hearing prior to transfer, no witnesses were identified, and Witowski refused to meet with her (pl. ex. 5).

5. In March 1994, the defendant became aware that it owed the plaintiff overtime pay for a period when she was directed by her supervisor to work off the clock. Incident reports confirmed that the plaintiff was asked to work off the clock, and a March 28, 1994, note stated "I feel we will be obligated to pay the 94.21 hours" (pl. ex. at 138–145). Another note said, "statute of limitations" (pl. ex. at 145). Despite recognizing that the plaintiff earned the wages, the defendant refused to pay her.

6. On April 13, 1994, the plaintiff advised Kearney that her health was poor and that she was not able to work overtime. Kearney told her, in front of other officers, that she would work overtime or he would take her badge away. Captain Byrd later overruled Kearney and relieved the plaintiff of her overtime demand.

7. In April 1994, the plaintiff's Saturdays and Sundays off were taken and given to a more junior officer, despite the fact that when she was transferred away from Sewell, Warden Baldwin assured her that she would retain those days off (Fleming dep. at 199.)

 Accepting the proposition that such conduct was the result of harassment, the plaintiff must show that the harassment was severe and pervasive. To satisfy this element of proof, the plaintiff must demonstrate both that the conduct was such that "a reasonable person would find hostile or abusive," and that the plaintiff "subjectively perceived the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The plaintiff has presented evidence from which a jury could reasonably find in her favor on this element.

 In determining a claim for a hostile work environment, the court may consider all of the circumstances, which may include:

[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. *Id.* at 23, 114 S.Ct. at 371.

The retaliatory harassment was consistent over the period of at least a year. While some may conclude that these incidents are isolated and not sufficiently pervasive or severe, a jury could conclude that in an environment where an officer must rely on fellow coworkers and supervisors to guarantee her safety and well-being, the alleged harassment taken in the light most favorably to the plaintiff could be considered sufficiently hostile.

As mentioned earlier, the defendant argues that the plaintiff was treated the same

---

5. "Blue shirts" are correctional officers with the ranks of Correctional Officer One to Corporal.

"White shirts" are Sergeants, Lieutenants, Captains and above.

as other officers and that she even received the officer of the month award. However, no evidence is provided to show that the treatment of other officers included: (1) repeated transfers, (2) threats of badge removal if they requested not to be assigned overtime, (3) being left on their posts without relief, (4) being denied payment for overtime hours as the result of the statute of limitations, and (5) relaxed attitudes by supervisors as to SCDC policy and incident reports.

▬ There is sufficient evidence to show that, if the plaintiff believed that she was not going to be supported by fellow officers, her physical safety was at risk. She was moved to maximum security, where she was repeatedly transferred. When inmates were violent or disrespectful towards her and she filed the appropriate paperwork to discipline them, little action was taken and the reports were lost.

In light of the evidence detailing the frequency, severity, possible threat of physical harm and treatment of the plaintiff, a reasonable person could find that the harassment was hostile and abusive.

▬ Finally, the plaintiff has demonstrated that her psychological well being was affected by her treatment at Perry. An incident report about the plaintiff's reaction to one of her many transfers states:

> She then started crying more. She stated that ever since Captain Sewell asked her to go to bed with him and she filed charges on him the administration has been after her. She stated that all she wanted was to do was her job and that going to bed with Captain Sewell was not part of her job.... She also kept asking the question what has she ever done to deserve to be treated like this. Cpl. Fleming then started sobbing and stated that she was sorry and that she would not be back until March 1, 1994 because she was sick. (pl. ex. at 147–48).

The plaintiff's counselor, Candace L. Dorsey, stated that the plaintiff was suffering from "Post Traumatic Stress Disorder" and that "once she found out she was going to be retaliated against for not going to bed with the Captain, she became very helpless and hopeless and felt as though she had no con-

trol over her environment" (pl. ex. at 81). A reasonable jury could conclude that the plaintiff subjectively viewed her environment as hostile.

### Causal Connection

▬ The plaintiff has provided sufficient evidence to show that there is a genuine issue of fact as to whether a causal connection exists between the protected activity of rejecting Sewell's advances and filing a sexual harassment claim and the retaliatory hostile environment.

First, the plaintiff testified that, although she was told not to discuss the complaint of sexual harassment with anyone, during the summer of 1993 news about the complaint became known within the institution. She had several individuals approach her about the pending investigation (pl. mem. at 7). Shortly after her transfer to maximum security under the direct supervision of Kearney, the plaintiff overheard a conversation between Kearney and someone else discussing her sexual harassment charge against Sewell (Fleming aff. at 2, ¶ 10). She alleges that at this time his conduct toward her changed. In addition, in June 1993 she received a call from someone, whom she identified as Sewell, stating, "It wasn't worth it was it?" (Fleming aff., ¶ 14).

Second, shortly after the plaintiff's transfer, upon her arrival at the D dorm, Lt. Rowina Williams told the plaintiff to "watch your back." The plaintiff filed an incident report about this statement, which was subsequently lost (pl. ex. at 188–191).

Third, the record contains evidence which supports the contention that Sewell used his position and authority to make other officers' jobs difficult. On one occasion, Sewell pointed out a new female correctional officer, one who did not work under his authority. He told the plaintiff "I'm getting rid of her," and within a few days the officer was fired for allegedly making an obscene gesture at a prisoner. Afterwards, Sewell gloated to the plaintiff, saying "I have a long reach" (Fleming aff. at 1, ¶ 4).

Similarly, Chukwuemeka Ikenegbu testified that Sewell told him to leave the plaintiff alone because he "wanted" her. He went so

far as to offer to reassign Ikenegbu to a position he wanted, so long as Ikenegbu quit being friendly with the plaintiff (Ikenegbu dep. at 234–235).

Also, Susan Simonson filed a sexual harassment complaint with Sewell alleging she had been harassed by another officer, and Sewell responded that if she "did not talk the way she did she would not be sexually harassed". Shortly thereafter, she was required to work late despite the fact that her supervisor knew she had to pick up her child at 4:30. Six weeks later, she was ordered by Sewell to work 12–hour days. Subsequently, her shift was changed from 8:00 a.m. to 4:30 p.m., to 10 p.m. to 6 a.m., which was impossible for her to do because of her parental responsibilities. Simonson believes that this change was ordered because she had filed a sexual harassment complaint (pl. ex. at 8–9).

### Legitimate Non-retaliatory Reason

The defendant argues that, as to the plaintiff's hostile environment claims, it has a legitimate nonretaliatory reason for the plaintiff's treatment, i.e., the critical security staff shortages at Perry during 1993 and 1994. However, no evidence has been submitted to rebut the plaintiff's contention that she was transferred an inordinate number of times. The plaintiff testified that throughout the six years of her employment with SCDC, she had never been similarly transferred or abandoned on post, even in times of staff shortages. No explanation was provided to respond to the plaintiff's allegations that the defendant failed to pay the plaintiff overtime, dealt inappropriately with disrespectful inmates, and lost incident reports.

A genuine issue of facts exists as to whether the plaintiff was retaliated against in the form of a hostile work environment. Therefore, the defendant's motion for summary judgment is denied as to the plaintiff's cause of action for retaliation in violation of Title VII.

### Constructive Discharge

■ A constructive discharge occurs when an employer deliberately creates intolerable work conditions in order to force an employee to resign. *Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 52, 130 L.Ed.2d 12 (1994); *Carter v. Ball,* 33 F.3d 450 (4th Cir. 1994). The plaintiff must prove two elements: (1) the "deliberateness" of the defendant's actions, and (2) the "intolerability of the working conditions." *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1354 (4th Cir. 1995).

■ The plaintiff's testimony is sufficient to raise a factual issue as to whether her working conditions were intolerable. The treatment she described as harassment, coupled with the daily stress of concerns for her own safety, could reasonably be considered intolerable.

An issue of fact also exists as to whether the defendant's conduct was deliberate. Intent may be shown by evidence that the employee's resignation was the reasonably foreseeable consequence of the employer's conduct. *Martin,* 48 F.3d at 1356; *Amirmokri v. Baltimore Gas and Elec. Co.,* 60 F.3d 1126 (4th Cir.1995). The defendant has not provided evidence of similar treatment of other officers in the form of transfers and relaxed attitudes in handling disrespectful inmates and incident reports, in violation of SCDC policy. A reasonable jury, in viewing the facts most favorable to the plaintiff, could conclude that such conduct was the result of the employer's deliberate acts to force the plaintiff to resign.

The defendant's motion for summary judgment as to constructive discharge is denied.

Now, therefore,

IT IS SO ORDERED that the defendant's motion for summary judgment is denied at this time. The defendant may renew this motion after all discovery has been completed.

IT IS SO ORDERED.

### ORDER

This matter is before the court on the defendant's motion for partial reconsideration of the December 18, 1996, order denying the defendant's motion for summary judgment as to the plaintiff's claim for retaliatory discharge in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*

For the reasons set forth below, the defendant's motion is denied.

### FACTS PRESENTED

The plaintiff, Doris Fleming, began working for the defendant, the South Carolina Department of Corrections ("SCDC"), at Perry Correctional Institution in October 1988 (Fleming dep., def. ex. A, at 20, 25, 30). The plaintiff was assigned to the position of correctional officer in the medium-security component of Perry, commonly referred to as "the yard" (Fleming dep. at 30–31). In October 1990, she was assigned to the position of medium-security operations officer, a permanent post. Although the plaintiff worked at different post assignments, she remained in medium security until 1993 (Fleming dep. at 43). On March 13, 1992, at the request of the captain of medium security, James Sewell, the plaintiff was transferred to the disciplinary office and placed in another permanent post assignment. The plaintiff alleges that, throughout her assignment in medium security, she was subjected to sexual advances by Sewell. Sewell would visit her post assignment and attempt to engage her in a sexual relationship. The plaintiff testified that he would say things such as, "if I ever had him, I wouldn't want a black man again." While the plaintiff worked under his direct supervision, Sewell made comments such as "come in here and get naked" and "spread your legs" and asked if she was "ever going to do it with him" (Fleming dep. at 159–167). In November 1992, the plaintiff adamantly refused Sewell's request for sex.

The plaintiff alleges that shortly after her refusal of Sewell's sexual advances, she received a lower than expected evaluation and was transferred to work posts in the yard (Fleming dep. at 77). The plaintiff asserts that she was initially retaliated against in the form of a lowered evaluation and a transfer in violation of Title VII because she engaged in protected activity by opposing the alleged sexual advances by Sewell. The defendant requests that this court find that the refusal of sexual advances by a supervisor does not constitute "opposition" that triggers the protection of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a).

### APPLICABLE LAW AND CONCLUSIONS

Section 704(a) of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants ... because [she] opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter. 42 U.S.C. § 2000e–3(a) (1994).

The defendant maintains that refusal to submit to a supervisor's sexual advances is not opposition under Section 704(a). However this court disagrees.

The statute specifically states that it shall be an "unlawful employment practice for an employer to discriminate against any of his employees or applicants ... because [she] opposed any practice made an unlawful employment practice by this subchapter ..." The defendant has not argued that the supervisor's practice of allegedly requesting sex from an employee is not an "unlawful practice" under Title VII, nor has it argued that the plaintiff's refusal of such requests were not "opposition". This court cannot ignore the language provided in the statute. The statute protects two different types of activity from retaliatory conduct. If not, Congress could have left out the first clause and created a retaliatory cause of action available only for an individual because "[she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1994).

The defendant argues that it is not appropriate to interpret Section 704(a) to include an employee's refusal to submit to a supervisor's sexual advances because (1) every sexual harassment claim would automatically state a retaliation claim, *see Del Castillo v. Pathmark Stores*, 941 F.Supp. 437, 438–439 (S.D.N.Y.1996); and (2) the claim of harassment should not be merged with a claim of

retaliation because an employee who sexually harasses a fellow employee would have no incentive to inform the employer of his actions, therefore knowledge of the harasser would not be fairly imputed to the employer. *Del Castillo,* 941 F.Supp. at 439.

First, not every sexual harassment claim would automatically state a retaliation claim. Sexual harassment claims are traditionally broken down into two forms: sexual harassment in the form of a hostile work environment [1] and *quid pro quo* sexual harassment.[2] *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir. 1983). After careful examination of the elements required to create a hostile work environment, it is not clear that every sexual harassment cause of action would necessarily make it possible for the plaintiff to bring a retaliation claim. As for the *quid pro quo* harassment claims, there may be a possibility that the plaintiff could bring a retaliation cause of action as well. However, as the plaintiff argues, the gravamen of a sexual harassment case is sexual harassment, while the gravamen of a retaliation case is retaliation. If the employer is motivated to take adverse employment action because of retaliatory animus, it is properly categorized as a retaliation claim. Even if permitting the refusal of a supervisor's sexual advances did permit a plaintiff to bring a retaliation claim and sexual harassment claim, there has been no explanation as to the harm that such a result would have. The plaintiff would always be required to separately prove the elements necessary under both causes of actions.

Second, in the case at hand, there is no need to have an incentive for the employee to inform the employer of his actions. The plaintiff has alleged facts which, a reasonable jury could conclude, may have imputed knowledge to the employer. In addition, if the plaintiff can show that Sewell was the plaintiff's supervisor with the ability to make managerial decisions, such as the right to fire and hire the plaintiff, his liability may be imputed to the employer without the filing of a complaint to place the employer on notice. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343 (4th Cir.1995); *see Also Spencer v. General Elec. Co.,* 894 F.2d 651, 658 n. 10 (4th Cir. 1990).

Now, therefore, based on the foregoing,

IT IS ORDERED that the defendant's motion for partial reconsideration is denied.

IT IS SO ORDERED.

1. The Fourth Circuit Court of Appeals requires proof of the following elements to establish a claim of hostile work environment sexual harassment under Title VII:
 1. that the conduct in question was unwelcome;
 2. that the harassment was based on sex;
 3. that the harassment was sufficiently pervasive or severe to create an abusive working environment; and
 4. that some basis exists for imputing liability to the employer. *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989), *aff'd in pertinent part,* 900 F.2d 27 (4th Cir.1990 (en banc).

2. The Fourth Circuit Court of Appeals requires proof of the following elements to establish a claim of *quid pro quo* harassment:
 1. the employee belongs to a protected group;
 2. the employee was subjected to unwelcome sexual harassment;
 3. the harassment complained of was based upon sex;
 4. the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision;
 5. the employer, as defined by Title VII, 42 U.S.C. 2000e(b) knew or should have known of the harassment and took no effective remedial action. *Spencer v. General Elec. Co.,* 894 F.2d 651, 658 (4th Cir.1990).