Martha **ARMSTRONG**, Appellant,

v.

**INDEX JOURNAL COMPANY**, Appellee.

No. 79–1506.

United States Court of Appeals,
Fourth Circuit.

Argued May 8, 1980.

Decided April 28, 1981.

Victoria L. Eslinger, Columbia, S. C. (Ann L. Furr, Eslinger, Furr & Delgado, Columbia, S. C., on brief), for appellant.

J. E. McDonald, Greenwood, S. C. (Burns, McDonald, Bradford, Erwin & Patrick, Greenwood, S. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BUTZNER and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

Martha Armstrong appeals the denial of her claim of sex-based employment discrimination brought under Title VII of the Civil Rights Act of 1964 against the Index Jour-

nal, a daily newspaper. She complains that because of her sex she was assigned to a separate classification in the Journal's advertising department, called "special salesman." Armstrong asserts that this classification receives lower base pay and less desirable advertising accounts than the classification "regular salesman," which is held exclusively by men. She further charges that her complaints about this discriminatory treatment led to her discharge. We reverse the judgment of dismissal because the Journal failed to rebut her prima facie case with respect to the conditions of her employment and because the evidence disclosed that she was discharged in violation of § 704(a) of the Act for opposing the Journal's unlawful employment practices.

I

In August, 1974, the Journal ran a female help-wanted ad offering an "opening for lady in advertising department." Armstrong responded and was hired as a special salesman. Her predecessor and successor in this position were also women; no man has ever been hired for this job. The Journal advertised for its regular salesmen through male help-wanted ads. Only men have held the position of regular salesman.

During her employment in the newspaper's display advertising department, Armstrong performed the same tasks as the male salesmen. The department sells, writes, designs, and supervises the printing of advertising that appears in the newspaper. To that end each salesman, including the special salesman, services a number of accounts. Armstrong solicited new accounts, sold additional advertising to her present accounts, laid out ads, drew illustrations for ads, wrote copy, and helped advertisers budget their accounts. She also promoted special features, such as the bridal and home improvement editions. Three advertisers attested to the excellent manner in which she handled their accounts.

Like the regular salesmen, Armstrong had accounts of varying difficulty and profitability. Her easiest accounts were called service accounts. The advertiser did its own writing and layout with this type of account, and all Armstrong did was pick up copy, make occasional changes, and deliver the ad to the composing room. On the other hand, Armstrong was responsible for several accounts for which she did the entire writing, layout, and drawing. She handled contract accounts where advertisers agreed to place at least a minimum amount of advertising per month, as well as less lucrative open-rate accounts, where the advertiser bought space irregularly.

The regular salesmen performed the same tasks. There were no additional or different tasks assigned to regular salesmen from which Armstrong was excluded. Armstrong, however, performed additional work not required of the regular salesmen. Because she was the only person in the department with artistic ability, she assisted the regular salesmen when an ad required an in-house drawing. While the men were at lunch, she assisted walk-in advertisers and substituted for the dispatch clerk in addition to working on her own accounts.

The Journal admits that Armstrong handled about the same number of accounts as the regular salesmen. It asserts, however, that she handled a different mix of accounts. She was assigned, it claims, only large service accounts and small contract and open-rate accounts. The Journal argues that because ads for the service accounts were prepared by the customers and the smaller accounts provided little opportunity for increasing advertising lineage, Armstrong exercised little skill and therefore deserved less pay.

At no point during her employment, however, was Armstrong told that there were certain types of accounts she was not allowed to handle. No restrictions were put on her solicitation of new accounts. While the larger accounts were assigned by the advertising manager, for some accounts a notice was posted on the department bulletin board, and any salesman, including the special salesman, could volunteer to handle the account. Armstrong worked in the same room as the regular salesmen and

attended departmental meetings where the salesmen collectively discussed ways of increasing advertising sales. During her employment, the regular salesmen were not even aware that Armstrong was classified as a special salesman. In fact, Armstrong often handled the accounts of regular salesmen when they were on vacation.

Armstrong was hired at the minimum base pay for any salesman, whether regular or special. Her base pay was increased four times. Nevertheless, throughout her employment she received a lower base salary than any of the regular salesmen, and the maximum base salary she could receive as a special salesman was substantially less than the maximum for regular salesmen. The ceiling on the base salary for her position was approximately $27 less per week than the ceiling for the male salesmen. Although Armstrong had not been employed long enough to reach the ceiling for her position, she knew that under the Journal's pay scale she could not receive the maximum amount paid to the male salesmen.

This pay differential between the two classifications of salesmen originated with Mary Crowder, Armstrong's predecessor as the special salesman. During her 14-year tenure, Crowder was paid a base salary less than the regular salesmen. Moreover, new regular salesmen were hired at a higher base pay than Crowder even though she had more sales experience. When she quit, because she could never attain the classification and pay of regular salesman, the advertising manager told her that he would replace her with a woman since no man would do the same job for the same money. The Journal then placed the female help-wanted ad to which Armstrong responded.

Armstrong complained a number of times about her job classification, the pay differential between the categories of salesmen, and a large service account that was assigned to her. Ultimately, these complaints led to her discharge under circumstances which we discuss in Part III.

After her discharge, Armstrong filed a timely complaint with the EEOC and instituted this action within 90 days of notice of her right to sue.

## II

In its conclusions of law pertaining to Armstrong's complaints about the conditions of her employment, the district court addressed only the differential in base pay between the salesmen. It recognized that Armstrong's base pay was less than that of the regular salesmen. Nevertheless, referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the court held that even assuming that Armstrong had established a prima facie case, the Journal rebutted it by showing that "either lack of experience or difference in job responsibility account for any pay differential."

We conclude that by concentrating on the pay differential the district court applied incorrect legal principles. Section 703(a)(2) of the Act, 42 U.S.C. § 2000e–2(a)(2), provides in part:

(a) It shall be an unlawful employment practice for an employer—

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . ., sex, . . . .

Therefore, contrary to the district court's ruling, the Act requires that the Journal's classification of its salesmen on the basis of sex as well as the pay differential, must be analyzed by the standards of *McDonnell Douglas*.

Viewed in this light, the record established a prima facie case of disparate treatment. Armstrong demonstrated that she was a member of a protected class, that she was employed in a job expressly limited to the protected class and that she was excluded from a higher paid classification whose duties she satisfactorily performed. The Journal's segregation of jobs by sex adversely affected her status as an employee and deprived her of the opportunity to reach the maximum salary payable to sales-

men. *See McDonnell Douglas*, 411 U.S. at 802 & n.13, 93 S.Ct. at 1824 & n.13 (1973).

Once Armstrong made out her prima facie case, the burden shifted to the Journal to "articulate some legitimate, nondiscriminatory reason ..." for the sex-based classification. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (1973). As the Supreme Court explained in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), "the burden which shifts to the employer is merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race."

The Journal's rebuttal of Armstrong's prima facie case rests on the contention that Armstrong's qualifications and job were not substantially equal to that of the male salesmen. The Journal claims that the males had more experience and education, that they exercised more skill, and that Armstrong's accounts were different from the accounts the males handled.

The Journal, however, had no specific qualifications with respect to either education or skill in entry level positions for either female or male salesmen. The sole difference in qualifications, as demonstrated by the advertisements soliciting applicants, is that one position was reserved for women and the other for men. The starting base pay for both positions was the same. The publisher acknowledged that Armstrong performed every duty set forth in the job description the Journal maintained for regular salesmen. He testified:

Q. So she has done everything that is in the job description for regular salesmen, hasn't she?

1. The publisher testified:
Q. Now, just to repeat one thing; was the job that Mrs. Armstrong had, as special salesman, any different than the job of a regular salesman?
A. It was in this respect: She handled several small accounts. In fact, most of the accounts were small, with one, or possibly two exceptions. In every instance, the possibility of a sizable increase in dollar sales was

A. Well, I can't separate advertising from advertising, because it is all advertising.

There is no proof that her work was less satisfactory than that of the male salesmen.

The male salesmen had longer tenure than Armstrong and, consequently, greater on-the-job experience. As we will subsequently explain, tenure is a proper consideration in fashioning relief. It does not, however, rebut the claim that the jobs were improperly segregated by sex.

The Journal's principal argument concerning the differences between Armstrong and the regular salesmen relates to the accounts they handled. With respect to this issue, the publisher testified that Armstrong handled accounts where "the possibility of a sizeable increase in dollar sales was practically negligible ..."[1] The advertising manager agreed that her accounts "didn't show any promise for any increase that would amount to anything." Based largely on this testimony, the district court found: "Accounts assigned to plaintiff were different in character, kind and responsibility from those assigned to Regular Salesmen."

A review of evidence concerning commissions Armstrong earned by increasing advertising lineage on her accounts reveals that the conclusory statements of the publisher and advertising manager are not supported by the evidence. Consequently, the court's finding based on this evidence cannot be accepted.

The Journal used a combination of salary and commissions to pay its salesmen. In addition to receiving a fixed base salary to which periodic raises were added, each salesman could earn commissions based on productivity.[2] Commissions were figured

practically negligible, with the exception of the A & P, the Colonial, and later the K-Mart. There was no chance of increase in sales. None whatsoever.

2. Although the special salesman received a lower base salary, her commissions were figured on exactly the same basis as the regular salesmen. Armstrong does not challenge the Journal's policy on commissions.

by a percentage of the net increase in lineage purchased by a salesman's accounts over the amount purchased the previous year. Thus, salesmen received commissions only if their accounts increased their advertising.

During her employment, Armstrong earned higher commissions than any regular salesman. The record discloses that she earned commissions totaling $3,440.12. During the same time span, only two male, regular salesmen were paid commissions on the same basis as Armstrong. The first earned $3,032.85, which was $407.27 less than Armstrong. The second earned $1,876.20, which was $1,563.92 less than Armstrong. Thus, tested by the Journal's own standard of productivity, Armstrong excelled in her ability to increase advertising revenues on her accounts. The Journal's claim that Armstrong only handled accounts with limited potential for increased advertising cannot stand in light of this evidence.

We conclude that the Journal did not articulate a legitimate nondiscriminatory explanation for segregating its sales personnel according to sex in a way that limited Armstrong's employment opportunities and prevented her from reaching the maximum salary payable to male salesmen. The Journal, through its lower cap on her pay scale, in effect told her: This high you may go but no higher, though males doing the same work can receive more. We therefore reverse the district court's judgment that the Journal did not discriminate against Armstrong in violation of Title VII.

█ Armstrong argues that she is entitled to back pay in an amount equal to the 20% difference between her salary and the average salary of the regular salesmen. We believe, however, that this is not the proper measure of damages, for it fails to take into account the longer tenure of the male salesmen and their consequent periodic increases in salary.

On remand, back pay for Armstrong should be computed by allowing her the same amount that an entry level, inexperienced male salesman would have received in base pay—without regard to commissions—during the period that Armstrong worked. We recognize that this will greatly reduce the recovery she seeks. Indeed, because of her relatively short tenure, her damages on this issue may be nominal. Nevertheless, we find no justification for awarding back pay by comparing her salary with the regular salesmen who had received periodic pay increases because of their longer tenure and greater on-the-job experience. Apart from deterring violations of the Act, an award of back pay is designed "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Computation of Armstrong's back base pay by measuring it against the pay that a hypothetical, similarly situated, male salesman would have earned achieves this equitable purpose.

### III

█ The second issue is Armstrong's claim that she was fired in violation of Title VII for protesting the discrimination practiced against her because of her sex.

In June, 1975, K-Mart began advertising in the Journal. Its account was twice as large as any other in the Journal, but because it was new its lineage commissions could not be computed, and the customary pay for handling it was $5 a week plus extra compensation whenever a preprinted insert was carried. The evidence discloses that the advertising manager planned to assign it to Armstrong, but, nevertheless, he offered it to a male salesman, who declined it. This salesman thought the pay was too low. When asked about his conversation with the advertising manager concerning the K-Mart account, the salesman responded:

> I brought the subject up once just in a general conversation. I asked [the advertising manager] who was going to get the K-Mart account and he casually said, "You can have it if you want it." I said I didn't want it, and the conversation was dropped. I didn't pursue it, and he didn't either.

He was also asked, "You and management did not agree on how much the K-Mart ad paid you, did you?" He answered, "I didn't agree with management on any account for $5 a week, of that scope."

The advertising manager acknowledged that the salesman was offered the K-Mart account and declined to handle it. In response to a question concerning his conversation with the salesman, he testified:

A. [He] came by me after it had been assigned and asked me, he said, "Who are you going to assign the K-Mart account to?" I said, "I am planning to assign it to Martha, but you can have it if you want it."

Q. You offered it?

A. Right. It was offered, but it was never assigned, if you want to call that offering.

In explanation of this offer and rejection, the advertising manager testified: "That was just to make conversation. That was all—it was just a joking conversation."

Armstrong accepted the K-Mart account. To accommodate the extra work it entailed, the advertising manager transferred five accounts she had been handling to other salesmen. Armstrong, like the male salesman, thought the pay for the K-Mart account was too low. Consequently, she added this complaint to her other complaints about the differential in her base pay and her job classification.

Prior to her discharge, the publisher told the advertising manager to fire her if she complained about anything. The publisher testified:

Q. You knew that Martha had complained before about the difference in her base pay and the men's base pay, did you not?

A. Yes. Martha complained about just about everything.

Q. As a matter of fact, [the advertising manager] had mentioned that to you on occasions, had he not?

A. I believe he had, yes.

Q. You had a discussion with [the advertising manager] wherein you told

him that if Martha complained any more about the base pay, that you weren't going to put up with it anymore and you wanted her fired?

A. No, not about base pay; about anything.

Q. About anything?

A. Anything.

In March, 1976, Armstrong, complaining that the K-Mart account involved too much work for the money, requested the advertising manager to transfer it. Also, she again complained about not being classified as a regular salesman. The advertising manager did not tell her that he had been instructed to fire her if she made any more complaints. On the contrary, when she asked what he would do if she refused to handle it, he said he would get someone else to take it. The manager's reply to Armstrong's question was not unusual, for accounts were transferred from time to time at the request of salesmen.

The advertising manager immediately told the publisher about Armstrong's complaint concerning the K-Mart account and her repeated request that her pay be equal to the mens'. They decided not to place her on the same pay scale as the men because they concluded her accounts were different. The publisher told the manager to fire her if she did not handle the K-Mart account. Although the publisher and the manager did not know whether Armstrong would refuse to continue with the account, the manager was under the impression that the publisher "had all he could take from Martha." The manager testified: "We did not know what she was going to do, but we were prepared if she did."

While the publisher and manager were conferring, Armstrong acted on the manager's assurance that he would get someone else to handle the account and put the K-Mart file on his desk. The manager, upon returning from the publisher's office, found the file and called Armstrong to his office. She told him that she was not quitting but that she would no longer handle the account. The manager then discharged her.

The district court denied Armstrong's claim. It held:

> Plaintiff's termination was based on plaintiff's refusal to carry out her assigned duties. This was not discriminatory, and was not pretext. Even if defendant's belief regarding plaintiff's refusal was incorrect (which the court does not find), there was no discrimination based on sex because the termination was not in fact based on sex. Defendant honestly believed plaintiff had refused. As was said in *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1257 (5th Cir. 1977) "Title VII & 1981 do not protect against unfair business decisions—only against decisions motivated by unlawful animus."

We reverse this aspect of the court's judgment because it is not based on a correct application of the opposition clause of § 704(a) of Title VII, 42 U.S.C. § 2000e–3(a) to the undisputed facts. This section provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . .[3]

To fall under the protection of the opposition clause in § 704(a), behavior need not rise to the level of formal charges of discrimination. *Sias v. City Demonstration Agency*, 588 F.2d 692, 694–96 (9th Cir. 1978). The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures. *See, e. g., Hearn v. R. R. Donnelley & Sons Co.*, 460 F.Supp. 546 (N.D.Ill.1978); *Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685 (D.Minn.1977). Section 704(a), however, was not intended to immunize insub-ordinate, disruptive, or nonproductive behavior at work. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972); *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976). An employer must retain the power to discipline and discharge disobedient employees. As *Hochstadt* explains, 545 F.2d at 231:

> [C]ourts have in each case to balance the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.

Applying the balancing test of *Hochstadt*, we conclude that the purpose of the opposition clause in § 704(a) of Title VII can be served only by affording Armstrong relief. Her conduct was not disruptive or disorderly. Without telling her that she would be fired, the manager had assured her that he would transfer the account if she would not handle it. The Journal has introduced no proof that such a transfer was impossible or even extraordinary. A male salesman had declined the account. He, too, thought it paid too little. In contrast to the treatment of Armstrong, the offer of the account to the male salesman and his rejection were simply regarded as a joke.

The manager's testimony about his conference with the publisher just before Armstrong was fired indicates that her possible refusal to handle the K-Mart account was not the sole reason for their irritation with her. They did not view the K-Mart problem as an isolated incident, but rather as the culmination of her persistent complaints. Indeed, the publisher had previously resolved to fire Armstrong if she contin-

---

**3.** The unlawful employment practices to which § 704(a) refers are set forth in § 703(a), 42 U.S.C. § 2000e–2(a), which in pertinent part provides:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . ., sex, . . .; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . ., sex, . . . .

ued complaining. The record discloses that Armstrong's only complaints pertained to her segregated job classification, the consequent differential in base pay between a female special salesman and a male regular salesman, and the pay for the K-Mart account, which the male salesman who declined the account also thought was too low. All of these complaints arose out of the discrimination the Journal practiced by soliciting applicants for sales work according to their sex and by limiting the job opportunities and base pay of its female special salesman. These practices are proscribed as unlawful employment practices by § 703(a).[4] In short, the uncontradicted evidence discloses that Armstrong was discharged because, paraphrasing the language of § 704(a), she opposed practices made unlawful by the Act.

On remand, the district court should require the Journal to offer her reinstatement to the advertising department at the rate of pay of a male salesman of comparable tenure including the time of her lay-off. She should be allowed back pay from the date she was fired until the offer is made. Her back base pay should be computed in the manner outlined in Part II. To this should be added reasonable compensation for the commissions she would have earned. From this sum there should be deducted the reasonable value of her services in her husband's business for which she did not receive any specific salary. Armstrong is entitled to recover her costs and a reasonable attorney's fee.

*REVERSED AND REMANDED.*

DONALD RUSSELL, Circuit Judge, dissenting:

The issue in this case is one of fact, not of law. The District Judge, who took live testimony and who observed the demeanor of the witnesses, made findings of fact on the credibility of the witnesses and resolved the disputed facts. He found that there had been no discriminatory treatment of the plaintiff either during her employment or in her discharge. The majority reviews de novo as it were that same record and, on its evaluation of the evidence, reverses the District Judge. I cannot agree and I dissent.

What is the discrimination suffered by the plaintiff which the majority finds occurred in this case on the basis of which it reverses the District Court? It cannot be that a male was preferred in employment over the plaintiff. The defendant confined the right of employment in this case to a woman. Accordingly, if there were any preference in employment it was suffered by males who were denied any opportunity to compete for that place, which represented the only addition made by the defendant to its advertising staff in the referral period; the preference in favor of a woman in making the employment selection assuredly did not constitute discrimination against the plaintiff. Thus, we do not have a *McDonnell Douglas*[1] situation, in which a female was denied a job which was later filled by a male. Our situation is one in which the employer strictly limited employment to a female.

Neither was there any sex discrimination in rate of pay at which the plaintiff was employed.[2] The majority finds: "[t]he starting base pay for both positions (i. e., the positions of the male salesmen and the female salesperson was the same." In short, if the plaintiff had been a male, without previous experience, his base starting pay would have been precisely the same as the plaintiff was given when she was employed.[3] So far as I can perceive, there is no violation of the Act in this regard.

4. *See* n.3 *supra*.

1. *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

2. The majority recognizes this throughout its opinion. In fact, it faults the District Judge for "concentrating on the pay differential."

3. The finding of the District Judge was:
"Prior to her employment on August 12, 1974, plaintiff had no previous experience in the advertising business and had most recently been employed as a production worker at Monsanto Company, near Greenwood, S. C., working as a member of the doff crew."

The theory on which the plaintiff premises her claim of discrimination is not that she was denied equality of pay with a male of like experience when she was employed but is that she did the same job as the male salesmen and was entitled to exactly the same salary as the male salesmen even though the latter had far longer seniority than the plaintiff. This is the slender reed by which the plaintiff seeks to support her claim of sex discrimination. The majority, however, is unable to accept this novel claim of the plaintiff to equal pay with that of salesmen with greater tenure and seniority. It concedes that "[t]he male salesmen had longer tenure than [the plaintiff] and, consequently, greater on-the-job experience"[4] and "tenure is a proper consideration in fashioning relief." And well it should, for the record shows that the defendant pursued an established policy of rewarding employees with periodic raises on a regular basis based on increasing seniority. Since the male employees had been employed so much longer than the plaintiff, their base pay had been necessarily more often raised periodically and was larger than that of the plaintiff. But—it must be observed—the plaintiff had not been discriminated against by a denial of periodic increases in pay as she had acquired seniority.[5] In the relatively short period that she was employed she had received four increases in base pay. There is no contention that the male salesmen had been favored with more during the same period.

Moreover, there had been no attempt to rig accounts in order to prejudice the plaintiff in earning bonuses. She received more in bonuses than the male salesmen. It may be, as the plaintiff contends, that she was particularly adept in increasing the volume of her accounts. But it would seem likely that her increase in volume was due to some extent to the type of accounts assigned her and this assignment could only have been made either out of fairness or favoritism to the plaintiff, but certainly not for purposes of discriminating against the plaintiff. Further, it is not contended that any accounts had been taken away from her in order to favor male salesmen. If anything, the plaintiff enjoyed a preferred position in the assignment of accounts, as shown by the bonuses she received.

From all this, it is plainly evident why the majority opinion made its ruling on the right of the plaintiff to back pay. It states first that the plaintiff was entitled by way of a beginning base salary simply to the "entry level, [base pay salary an] inexperienced male salesman would have received in base pay—without regard to commissions—during the period that [the plaintiff] worked." It added properly that "we find no justification for awarding back pay by comparing her salary with the regular salesmen who had received periodic pay increases because of their longer tenure and greater on-the-job experience." Since, as we have seen, the plaintiff was not discriminated against in salary, this formula for calculating back pay would really net the plaintiff nothing and the majority recognized this, for it said back pay, under this calculation, would likely be but "nominal." And this was so because the plaintiff had suffered no loss of pay by reason of any improper sex discrimination.

Since the plaintiff has not suffered by a denial of employment or in wages less than those given males in like situation, wherein has there been discrimination? The majority opinion identifies these grounds for finding discrimination: i. e., she "was employed in a job expressly limited to the protected

And later:
>"When plaintiff was employed, she was employed at the beginning base pay applicable to all beginning salesmen who did not have prior experience."

4. The District Judge found:
>". . ., the Regular Salesmen, both had college degrees and over four (4) years previous experience in the Advertising Department at the time plaintiff was hired in 1974. Plaintiff's educational background consisted of a high school diploma."

5. The finding of the District Judge on this point was:
>"The increases in plaintiff's base pay were at least as great as base pay increases granted male employees in the Local Division."

class" and "excluded from a higher paid classification whose duties she satisfactorily performed" and "deprived her of the opportunity to reach the maximum salary payable to salesmen." It would color this statement by characterizing the defendant's policy as a "segregation of jobs by sex," and declared that, by virtue of "segregating its sales personnel according to sex in a way that limited [plaintiff's] employment opportunities," it had violated plaintiff's rights. I am unable to follow this reasoning.

The majority refers to the male salesmen as regular salesmen and the plaintiff as a special salesperson. This is what I assume the majority characterizes as "segregation of jobs by sex." All, both the plaintiff and the male salesmen, however, had regular jobs. Their duties were exactly the same. Each had a regular assignment of accounts. Based on their experience when hired, each had had the same beginning salary; each had had the same opportunity for like periodic increases in base pay; each had had the same right to earn bonuses on exactly the same terms. There was no "cap" on the right of the plaintiff to future periodic increases any more than there was a "cap" on the right of male salesmen to future periodic increases. Surely it cannot be a violation of the Act, or an improper "segregation of jobs by sex," when the female receives the same pay as a male with similar experience would receive. Yet that is this case, a case unlike any other sex discrimination case in the books. In the typical sex discrimination case, the plaintiff has suffered discrimination in employment, or in job tenure, or in wages, or in bonuses, or in periodic pay increases. There is nothing like that in this case. The only prejudice of discrimination arises simply out of being designated as a special salesperson rather than a regular salesman, as are the males. That is the sum of the alleged discrimination. I cannot believe that alone is enough.

Actually, a large part of the plaintiff's case consists of claims of unfair treatment of Mrs. Crowder who had been employed by the defendant before the plaintiff was employed. But the plaintiff cannot ground a case in her favor on some mistreatment, if any there was, of Mrs. Crowder.[6] This is an action solely for the redress of injury suffered by the plaintiff—not one to redress a wrong, if wrong there was, suffered by Mrs. Crowder.[7]

To sum up this phase of the matter, the District Judge, in my opinion, did not commit clear error in finding an absence of sex discrimination nor do I think that he erred in his findings in this respect "by concentrating on the pay differential." In so "concentrating" he followed the invariable practice in sex discrimination cases of comparing rates of pay between male and female employees. As I have said, I suggest this is the first and only case in which a female employee, employed on the same wage basis as comparable male employees and having the same duties and rights as the male employee in a division, has been found to have a cause of action for sex discrimination.

In addition, I do not think the District Judge committed clear error in his findings on the plaintiff's discharge. By her own testimony, the plaintiff was a constant gadfly, who was continuously taxing the patience and tolerance of her superiors. She complained about everything. When, finally, she was given a direct order, she defiantly disregarded it. An employer is not required to tolerate such insubordination from an employee. I agree with the District Judge, who wrote in this connection:

"Plaintiff's termination was based on plaintiff's refusal to carry out her assigned duties. This was not discriminatory, and was not pretext. Even if defend-

---

**6.** The District Judge found specifically:

"There is not the slightest showing that any alleged discrimination was practiced against Mary Crowder or carried over as part of a pattern of discrimination against plaintiff."

**7.** Mrs. Crowder's explanation of her reason for quitting was:

"Well, after I was told I wasn't a salesman, it kind of took all my ego away. I felt like I would never get anywhere—any higher salary—so I just decided that I would quit."

ant's belief regarding plaintiff's refusal was incorrect (which the court does not find), there was no discrimination based on sex because the termination was not in fact based on sex. Defendant honestly believed plaintiff had refused. As was said in *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1257 (5th Cir., 1977) 'Title VIII & 1981 do not protect against unfair business decisions—only against decisions motivated by unlawful animus.' "

This finding of the District Judge, I respectfully submit, is not clearly erroneous; and unless we are able to say that the findings of the District Judge are clearly erroneous, we are without authority to reverse.

For the reasons assigned, I would affirm the learned District Judge.