UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEPHANIE W. DEA and ROGER M. H.
CHAN, as personal representatives of
the Estate of Stanley J. Dea,
              *Plaintiffs-Appellants,*

v.                                          No. 97-1572

WASHINGTON SUBURBAN SANITARY
COMMISSION,
              *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-93-3677-DKC)

Argued: October 29, 1998

Decided: June 15, 2001

Before WIDENER and MURNAGHAN,* Circuit Judges,
and Samuel G. WILSON, Chief United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Reversed and remanded by unpublished opinion. Judge Widener
wrote the opinion, in which Judge Wilson joined.

_____

  *Judge Murnaghan heard oral argument in this case but died prior to
the time the decision was filed. The decision is filed by a quorum of the
panel. 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** Douglas C. Herbert, Jr., LAW OFFICE OF DOUGLAS C. HERBERT, Washington, D.C., for Appellants. Bruce Stephen Harrison, SHAWE & ROSENTHAL, Baltimore, Maryland, for Appellee. **ON BRIEF:** Mary Chlopecki, LAW OFFICE OF DOUGLAS C. HERBERT, Washington, D.C.; Clint D. Bolick, Richard D. Komer, INSTITUTE FOR JUSTICE, Washington, D.C., for Appellants. Elizabeth Torphy-Donzella, SHAWE & ROSENTHAL, Baltimore, Maryland; Nathan J. Greenbaum, General Counsel, Robert H. Drummer, Associate Counsel, WASHINGTON SUBURBAN SANITARY COMMISSION, Laurel, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

WIDENER, Circuit Judge:

Stanley J. Dea brought suit against his employer, the Washington Suburban Sanitary Commission, under the Opposition Clause of Title VII, § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), alleging retaliation based on his refusal to comply with affirmative action policies that Dea believed to be unlawful.[1] The court entered judgment in favor of the Commission, and Dea appeals. Dea argues that the district court relied on clearly erroneous factual findings in entering judgment against him. We agree that the district court erred

---

[1]Dea originally sued the Commission both for injunctive relief, with regard to an earlier disciplinary warning, and monetary damages, associated with his eventual involuntary transfer. During the pendency of his appeal, however, Dea died and his estate was substituted as the appellant pursuant to Fed. R. App. Proc. 43. Thus, as claims for such injunctive relief do not generally survive the death of the plaintiff, see *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 964 n.8 (4th Cir. 1985), Dea on appeal asserts only a claim for money damages.

regarding those factual determinations and that, in light of those errors, Dea is entitled to judgment in his favor. Accordingly, we reverse and remand this case to the district court to ascertain appropriate damages.

I.

The Commission oversees the water and sewer systems for Prince George's and Montgomery Counties in Maryland. With a population to serve of about 1 million, the Commission's service is big business. Dea, a registered professional engineer holding a Ph.D in environmental engineering, joined the Commission as the Director of the Bureau of Planning and Design within the Department of Engineering in 1977. His responsibilities included planning and designing water and waste water treatment facilities as well as overseeing some 250 employees. Dea held that position until his transfer on April 2, 1990, to Director of the Office of Engineering Programs. It is this transfer which gave rise to this litigation. At all relevant times, Dea's direct supervisor was Stephen Profilet, and the Commission's General Manager was Richard Hocevar. The record does not disclose any other employee superior in rank to Dea.

In September 1989, Mike Ruddo, the Project Development Division Head who reported directly to Dea, retired, leaving Dea with the responsibility of making a recommendation to Profilet regarding the vacancy. Out of seven applicants for the Division Head position, only one, a woman named Diane Lucci, was not a white male. This presented a problem in light of the Commission's affirmative action policy, which effectively defined minority as all employees except white males.

Dea interviewed all seven candidates and ranked them based on a variety of criteria. He ranked Miss Lucci fourth of the seven candidates. Dea then reinterviewed the top three candidates and chose one, Dave Coe, to recommend for the Division Head position. Difficulty arose, however, when Profilet learned that Miss Lucci was not on his short list for second interviews. The Commission believed that this decision did not comport with its affirmative action policy, which was to promote a qualified minority candidate if one was available even though that candidate was not the best qualified for the job.

Aware that Dea and Hocevar had disagreed over the application of this policy in the past, Profilet met with Richard Haddad, Director of the Commission's Offices of Management and Budget, to discuss the situation. Haddad recommended that Dea be transferred to a new position which would not involve any responsibility regarding personnel decisions. Profilet proposed this solution to Hocevar, and Dea was transferred in April 1990 to a newly created position, Director of Engineering Programs. Profilet then recommended the promotion of Miss Lucci to the Division Head position.

Dea alleges that the district court committed clear error in determining 1) that he lacked both a good faith belief and a reasonable basis for a good faith belief that the Commissions's affirmative action policies were unlawful under Title VII; 2) that his means of opposing those policies was unreasonable; and 3) that Profilet's uncontradicted testimony regarding his own motive for transferring Dea was not credible. The correction of those errors, Dea argues, compels the determination that the Commission disciplined him for refusing to violate Title VII and entitles him to judgment as a matter of law pursuant to Title VII's Opposition Clause.[2]

---

[2]Dea testified that he was familiar with that part of the affirmative action plan which states in pertinent part:

> nor is an employer required to hire a less qualified person in preference to one better qualified, providing the qualifications used to make such relative judgements realistically measure the personal ability to do the job in question.

The meaning of that part of the plan is perfectly plain. It is directly contrary to the affirmative action enforced by Hocevar that a qualified minority applicant should receive a vacant job although better qualified applicants were at hand. No justification for the departure from the literal wording of the plan was offered at trial in the district court nor is it offered now. In view of that, even questioning that Dea had a good faith belief that he was protesting a violation of law is itself doubtful, at best, and on this record is not justified. A simple recognition of this provision of the plan at the outset of the trial would have vastly shortened this proceeding with the resulting laborious, lengthy and painstaking *McDonnell Douglas* analysis. As the case has turned out, to affirm the judgment of the district court it would be necessary to base such affirmance almost entirely on the fact that the district court believed that Dea, and Profilet,

## II.

The Opposition Clause of Title VII makes it "an unlawful employment practice for an employer to discriminate against any of its employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). The series of proofs and burdens outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), apply to retaliation claims under § 704(a). See *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). To establish a prima facie claim of retaliation under Title VII, a plaintiff must establish (1) that he engaged in protected activity, (2) that he was subject to an adverse employment action, and (3) that there was a causal link between the two. *Beall v. Abbot Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse action. *Beall*, 130 F.3d at 619. If the employer does so, the plaintiff must then demonstrate that the employer's reason was pretext for retaliation by proving both that the reason was false, and that retaliation was the real reason for the challenged conduct. *Beall*, 130 F.3d at 619. However, under appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Equal Employment Opportunity Comm'n v. Sears Roebuck and Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

In order to make such a case, Dea first must demonstrate that his failure to recommend Miss Lucci was protected opposition activity, second that his transfer constituted an adverse employment action, and finally that his failure to recommend Miss Lucci was causally

and probably Haddad, were not truthful, which position the record does not support.

Indeed, the brief of the Commission in this court states plainly:

Hocevar's policy was that if a qualified minority (a term that in WSSC parlance included women) was available for a high level position that person should be selected.

connected to his transfer. Then, Dea must overcome the Commission's present assertion that he was transferred because of his inaction with respect to the job vacancy by showing that this proffered reason is pretextual and that he was in fact transferred because of his unwillingness to comply with an affirmative action policy that he believed violated Title VII.

### A.

We first consider whether Dea's refusal to recommend Miss Lucci for the Division Head position was opposition activity protected by Title VII. The scope of the opposition clause hinges both on the employment practice opposed by an employee's opposition conduct and on the nature of that conduct.

Dea must establish that he opposed an employment practice "made . . . unlawful" by Title VII. 42 U.S.C. § 2000e-3(a). A Title VII plaintiff bringing a claim for retaliation need not establish that the employment practice he opposed in fact violated Title VII. See *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985). At a minimum, however, a plaintiff bringing a claim for retaliation must have held a reasonable, good faith belief that the employment practice he opposed was violative of Title VII. See *Biggie v. Albertsons*, 894 F.2d 1497, 1503 (11th Cir. 1990) (finding that plaintiff must "prove that he opposed an unlawful employment practice which he reasonably believed was occurring"). This belief must be objectively reasonable in light of the facts and record presented. See *Little v. United Techs.*, 103 F.3d 956 (11th Cir. 1997) (ruling that employee's opposition to remark by coworker was not protected where, because the remark could not be attributed to the employer, there was no objectively reasonable belief that it violated Title VII). Dea testified that he "believed it was illegal and discriminatory" to recommend Miss Lucci solely on the basis of her gender when he did not believe her to be the most qualified candidate. In its abbreviated analysis of this issue, the district court indicated only that Dea "is opposed to all affirmative action and did not have, and had no basis for, a good faith belief that whatever policies were in effect were illegal" and concluded that Dea's testimony to the contrary was "not credible." "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is

left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). We have reviewed the record and, in light of the extensive evidence corroborating Dea's testimony as to his good faith belief and supporting the reasonableness of that belief, we are left with the definite and firm conviction that a mistake has been committed and find the ruling of the district court to be clearly erroneous.[3]

The District court concluded that Dea was "opposed to all affirmative action" but did not have a good faith belief that the Commission's policies as applied to his recommendation for the Division Head position violated Title VII. Although Dea opposes affirmative action, he testified that he did not believe the Commission's affirmative action policies were illegal until May of 1989. Prior to May of 1989, Dea complied with the affirmative action policy because, although he objected to it, he did not understand it to be illegal. In fact, as a department manager, he signed off on new drafts of the Commission's affirmative action policies, indicating approval of them. Dea also testified that, on at least one prior occasion, he promoted a lesser qualified minority employee over other applicants at the direction of his superiors because he had no reason to believe at that time that the Commission's policies were illegal. The Commission offered no evidence contradicting this testimony even though General Manager Hocevar, Profilet, and Haddad, the Commission's current Director of Human Resources, each testified at trial.

Dea testified that he came to believe that the Commission's affirmative action policies were illegal on May 24, 1989, prior to the vacancy in the Division Head position at issue in this case, when a meeting was held at the Commission to discuss the impact of the Supreme Court's decision in *City of Richmond v. Croson*, 488 U.S.

---

[3]Dea correctly argues that he can prevail either by showing that he held a reasonable, good faith belief that the Commission's affirmative action policy violated Title VII or that the policy did, in fact, violate Title VII. Because we find the district court's conclusion that Dea lacked a reasonable good faith belief to be clearly erroneous, we do not reach the legality of the Commission's affirmative action policy.

469 (1989), on the Commission's affirmative action policies.[4] The meeting was attended, among others in attendance, by the commissioners and officers of the Commission, the Commissions's in-house counsel, General Manager Hocevar, Dea, and outside counsel retained by the Commission to review the legality of its affirmative action policies. Dea testified that the Commission's outside counsel gave his opinion that the Commission's affirmative action policies did not satisfy the requirements set by *Croson* for a lawful affirmative action program. Specifically, outside counsel advised the Commission that, after *Croson*, an affirmative action program must be narrowly tailored for use only in a specific area and to cure a specific problem and that a predicate study must evaluate prior discrimination and its impacts to develop the statistical support required to justify the program. Dea testified that he was shocked by the Commission's proposed response to outside counsel's advice which consisted of cosmetic changes to the program rather than efforts to comply with the requirements of *Croson*. Dea's account of this meeting was not contradicted by Hocevar or anyone else present at the meeting. The *only* evidence offered by the Commission relating to Dea's testimony on this point was a stipulation that Nathan Greenbaum, the Commission's general counsel does not recall that he discussed at that meeting either the Commission's employment practices, or the applicability of *Croson*, or that he made "any statements" about such employment procedure.

Dea's good faith belief in the illegality of the Commission's policies was also bolstered by an article he read in the December 1989 issue of the Journal of the American Water Works Association, circulated to him by the Commission, entitled "Racial Preferences in Contracting and Employment." Written by an attorney, this article stated that, after the Supreme Court's decision in *Croson*, "a racial prefer-

---

[4]At trial, the Commission objected to this testimony on the grounds of attorney-client privilege. The district court overruled the Commission's objection and admitted the testimony under seal. Because the Commission has not appealed this evidentiary ruling, we do not need to address the applicability of attorney-client privilege to this testimony and appropriately may treat Dea's testimony regarding the meeting as part of the record on appeal. We find, however, that there is no basis to maintain this aspect of the record under seal on appeal and accordingly order the seal removed.

ence in any aspect of employment . . . is suspect and subject to strict scrutiny." The article also noted that racial preferences will be upheld only if they are supported by "detailed and specific findings based on evidence of past discrimination sufficient to make the remedy a matter of 'compelling public interest' and then only by a plan 'narrowly tailored' to correct and remove the effects of past discrimination." The article instructed that evidence of "general 'societal discrimination' will not suffice" to support racial preferences and that a study supporting such preferences "should be specific to particular races and should discard the notion that discrimination against one minority is discrimination against all." In closing, the article noted that although the *Croson* decision dealt with minority set aside contracting programs, "the decision also has implications for affirmative action programs."

Furthermore, Dea's personal counsel at the time, in a letter to the Commission on Dea's behalf appealing the General Manager's decision to discipline him because of his handling of a prior hiring decision, characterized the Commission's affirmative action policies as "out-of-date considering the most recent pronouncements of the Supreme Court." The official letter of reprimand issued to Dea by the Commission in January of 1990, after Dea's appeal of that matter but before Dea's decision not to recommend Lucci for the Division Head position, recognized that "Dr. Dea argues that the Commission's policies are out-of-date in light of recent Supreme Court decisions . . . ." Finally, two of the commissioners testified that they believed Dea's opinion as to the illegality of the Commission's policies was held in good faith.

Given the evidence explaining Dea's good faith belief, the lack of evidence contradicting it, and the lack of explanation on behalf of the district court for discrediting it, we hold the district court's finding that Dea lacked a good faith belief to be clearly erroneous.

Dea must also establish that he reasonably believed that the employment practice which he opposed was an unlawful employment practice under Title VII. *Biggie v. Albertsons*, 894 F.2d at 1503. On these facts, the same evidence that bolsters the existence of Dea's good faith belief supports its reasonableness. Dea cited as a basis for his belief the conclusions of the Commission's outside counsel, of his

own attorney, and of the author of the article he read in the Journal of the American Water Works Association that affirmative action programs must be narrowly tailored to address prior discrimination and must be supported by a study indicating that affirmative action is necessary for a specific minority with regard to a specific position. He also testified without contradiction that no such study had been done at the Commission and that there was no specific affirmative action goal set for the application of affirmative action policies to Division Head positions with respect to white females. Dea noted, however, that there was a pervasive understanding at the Commission, at the direction of General Manager Hocevar, that affirmative action should be applied to all management-level positions. Hocevar's testimony, as well as the testimony of other Commission employees, corroborates Dea's statements on this point. In fact, Dea had been disciplined by the Commission in a prior instance for his failure to be "sufficiently sensitive" to the Commission's affirmative action policies in a situation when no goal or directive from his supervisors mandated that affirmative action be applied to the particular position in question. On this evidence, Dea reasonably could have believed to be unlawful the Commission's policy which required promotion of a lesser-qualified minority to the Division Head position without first having conducted the evaluation of prior discrimination that the Commission's outside counsel, his attorney, and the article he reviewed, told him was required. Indeed, he hardly could have concluded otherwise and we conclude, without deciding the legality of the Commission's affirmative action policies, that Dea's belief was reasonable that application of the Commission's affirmative action policies to the Division Head position for which he was making a recommendation would violate Title VII and that the district court's finding to the contrary was clearly erroneous.

To be protected under Title VII's Opposition Clause, Dea must also establish that the nature of his opposition conduct was reasonable. This court has applied a balancing test to distinguish between protected opposition activity and unprotected, disruptive behavior. *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 413-14 (4th Cir. 1999). The balancing test in question pits "the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of

personnel." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259-60 (4th Cir. 1998). The law is clear that protected opposition activity is not limited to an employee's participation in the formal processes associated with the official adjudication of discrimination claims. See *Armstrong v. Index Funds Co.*, 647 F.2d 441, 448 (4th Cir. 1981). On the contrary, informal expressions of one's views, whether through established grievance procedures or alternative forms of protest are protected by the statute so long as the employer's business interest in preventing those expressions does not surpass the overriding interests embodied in the Opposition Clause. *Laughlin*, 149 F.3d at 259-60; *Armstrong*, 647 F.2d at 448. Nevertheless, Title VII does not protect "insubordinate, disruptive, or nonproductive behavior at work."[5] *Armstrong*, 647 F.2d at 448. The district court concluded that Dea had failed to prove that "his method of complaining about affirmative action was reasonable within the context of his duties and responsibilities." We find this conclusion, largely factual, to be clearly erroneous.

Dea was charged with making a personnel recommendation which he sought to do within the boundaries of Title VII as he understood them. Dea carefully evaluated the candidates for the open Division Head position in order to make his recommendation. His evaluation led him to rank Lucci fourth among the seven candidates. Profilet, Dea's supervisor and the person who recommended the promotion of Miss Lucci and transferring Dea, testified that he agreed with Dea's assessment that Miss Lucci was not the most qualified candidate for the position and that her qualifications placed her comparatively in the middle third of the applicants. General Manager Hocevar testified

---

[5]An example of such unprotected activity can be found in *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253 (4th Cir. 1998). Without authorization, Karen Laughlin removed relevant, confidential documents from her supervisor's desk, copied and replaced them without his knowledge and sent them to a former co-worker to aid in that former co-worker's pursuit of a discrimination complaint. *Laughlin*, 149 F.3d at 256. Upon learning of this breach of trust, MWAA fired Laughlin. *Laughlin*, 149 F.3d at 256. On balance, we held that "MWAA's strong interest in protecting sensitive records outweigh[ed] Laughlin's interest" and thus "Laughlin, as a matter of law, did not engage in protected oppositional activity . . . ." *Laughlin*, 149 F.3d at 260.

only that — in hindsight, as he was uninvolved with the initial hiring decision, and he mentioned no characteristics of any applicant — he believed the applicants ranked by Dea as the top four were equally qualified. Even now the Commission does not argue that Miss Lucci was more qualified than the other candidates.[6] It is undisputed that Dea had thirty-four years of water and waste water management experience and seventeen years of experience as a Director at the Commission with responsibility for employment decisions. As noted, two hundred and fifty employees were under his supervision. While personnel recommendation decisions are subject to some level of objectivity, many inherently remain, in large part, subjective. Such decisions essentially require a decisionmaker to put his own name and reputation at stake by endorsing a candidate's potential for performance. The Commission hired Dea, at least in part, to exercise his discretion and to evaluate candidates for personnel recommendations, which is what he did in this instance.

Dea's actions more closely resemble those deemed by the courts to

---

[6]Such lack of opposition to the ranking of Dea is understandable. When the vacancy opened up, a list of seven applicants was sent to Dea through Profilet, by William Key, a senior personnel specialist. The Commission does not claim that Dea had anything to do with making up this list of seven. Dea interviewed all seven, making extensive notes on each, all of which are a part of the record. Following these interviews, he then prepared a short list of three and re-interviewed them. He found one Dave Coe to be the best qualified and James Shabelski and Dominic Tiburzi to be second and third. Miss Lucci was ranked fourth by Dea. Coe was not only the senior of the seven, having been employed by the Authority for some 20 years, he was rated as superior by the personnel department, with the others rated fully satisfactory. A detailed item-by-item score sheet, with points awarded from 1 to 20, was prepared by Dea considering some nine characteristics which Dea considered related to the job and were: technical competence, managerial capability, experience, leadership/administration, initiative/resourcefulness, communication skills, judgement, cooperation, and team building. Coe scored a total of 88, while Miss Lucci scored 69. Tiburzi scored 77 and Shabelski scored 75. Not one of these figures for any applicant has been contested by the Commission by way of evidence, although the Commission's brief takes issue with Dea's work. The district court made no finding in this respect.

be legitimate, protected opposition activities than those disruptive, disorderly acts that have been denied Title VII protection. In *Equal Employment Opportunity Comm'n v. St. Anne's Hosp.*, 664 F.2d 128, 132 (7th Cir. 1981), for example, the Seventh Circuit approved a claim under the Opposition Clause contesting the discharge of Barbara Herzon, a hospital employee who "used her authority to hire a black employee because she considered him the most qualified applicant for the job." Like Dea, Herzon did nothing more than comply with what she reasonably believed to be the requirements of Title VII in the execution of her personnel responsibilities. Cf. *Armstrong*, 647 F.2d at 444, 448 (finding that an employee's refusal of an instruction to handle an undesirable sales account which was assigned to her because she was female was protected opposition activity).

The Commission argues that Dea's opposition to its affirmative action policies was disruptive because it ignored warnings given to him which instructed how such concerns should be raised. The Commission indicates that Dea failed to raise his concerns about its affirmative action policies directly with General Manager Hocevar, as it instructed in a disciplinary letter to Dea regarding a previous employment decision. The disciplinary letter in question, however, indicates only that Dea should "review all Commission policies relating to hiring practices" and "arrange to meet with the General Manager" if he has "any questions whatsoever concerning these policies." Dea did not have questions about the affirmative action policy. Dea understood both the formal and informal policies — his understanding of what the policies required was confirmed by the Commission's own evidence at trial — and reasonably believed them to violate Title VII. Furthermore, Hocevar and the Commission were aware of Dea's concerns about the legality of their formal and informal affirmative action policies. Dea raised those concerns with Profilet, his direct supervisor, and in the disciplinary hearing regarding his previous employment decision.

The Commission's written decision after Dea appealed the previous disciplinary action imposed by General Manager Hocevar states only that he "should have raised questions concerning such policies, without challenging the same through a specific hiring practice" and that "prior to finally making the hire in question, he should have discussed this matter with Mr. Hocevar." Dea did not violate this prohi-

bition. Dea did not flaunt the Commission's affirmative action policies by making a final hiring decision that contradicted them. Instead, Dea opposed the policies through a nonbinding recommendation which was subject to Hocevar's review. Dea's obligation was to recommend a candidate for the Division Head position, not to make the final hiring decision. Dea knew that his recommendation was subject to review by Profilet and ultimately by Hocevar, who was always involved in the selection of Commission Division Heads. Profilet testified that he could have hired Miss Lucci himself, but that he wanted to give Dea a chance to comply with the affirmative action policies and that, if Dea recommended anyone other than Miss Lucci, Profilet would "check [the recommendation] out with the General Manager," who would most likely disapprove the recommendation.

Neither did Dea's recommendation contradict an express instruction with respect to how the position should be filled. The Commission's affirmative action plan did not contain a written affirmative action goal with respect to the Division Head position, and Dea received no direct orders regarding how it should be filled. Nonetheless, Dea knew that General Manager Hocevar wanted with regard to high-level positions "that a qualified minority should be selected if one was available." Indeed, Hocevar testified that, in order to achieve the objectives of the Commission's affirmative action policy, he was willing to run the risk of being accused of reverse discrimination or being sued by a non-minority employee who was denied a position. The Commission believed that its employees should assume that its affirmative action policies had been reviewed by legal counsel and that they complied with Title VII.

Title VII does not require Dea to take risks or to accept blindly that his employer's policies comply with Title VII. Faced with an obligation to make a recommendation for a position that he knew would be reviewed before implementation, Dea chose to recommend the candidate he considered to be best qualified. Although this recommendation did not comply with Hocevar's pervasive affirmative action policy, which Dea believed to be violative of Title VII, the recommendation did not contradict the Commission's written affirmative action policy and it did not bind the Commission to Dea's recommended course of action. We are of opinion that such a non-binding recommendation is not disruptive, unprotected activity. Neither are

Dea's actions unprotected as the disloyalty of a manager with hiring authority to the Commission's affirmative action policies.

> Almost every form of "opposition to an unlawful employment practice" is in some sense "disloyal" to the employer, since it entails a disagreement with the employer's views and a challenge to the employer's policies. Otherwise the conduct would not be "opposition." If discharge or other disciplinary sanctions may be imposed simply on "disloyal" conduct, it is difficult to see what opposition would remain protected under § 704(a).

*EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir. 1983). After balancing Title VII's purpose to protect persons engaging reasonably in activities opposing discrimination against Congress' desire to leave employers in control of the selection and control of their personnel, we find that Dea's opposition activity was reasonable in these circumstances and that the district court's finding to the contrary is clearly erroneous.

### B.

Next, we turn to the second element of Dea's unlawful retaliation claim and consider whether or not his transfer constituted an adverse employment action. We believe that it did, and there appears to be little disagreement between the parties in this regard. Counsel for the Commission conceded at oral argument that "if you look at certain indicia, supervisors, responsibilities, number of people below you, et cetera . . . it can be characterized as a demotion." Thus, the district court properly found that Dea's transfer did constitute an adverse employment action. See *Munday v. Waste Mgt., Inc.*, 126 F.3d 239, 243 (4th Cir 1997) (relying on *DiMeglio v. Haines*, 45 F.3d 790, 804 n.6 (4th Cir. 1995), for the proposition that reassignment may constitute an adverse employment action).

### C.

The final element of an illegal retaliation claim requires that Dea establish a causal link between the protected activity, his refusal to

recommend Miss Lucci, and the adverse employment action, his transfer. See *Beall*, 130 F.3d at 619. A prima facie showing of causation requires little proof. See *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998) (finding that fact of adverse employment actions following filing of EEOC claim met the prima facie burden for causation); *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991) (plaintiff stated a prima facie case even though there was no evidence of causal connection other than the fact that plaintiff was fired after bringing a lawsuit).

The record in this case contains ample evidence of the link between Dea's transfer and his refusal to recommend Miss Lucci. Profilet testified that "the decisive event" that led him to institute Dea's transfer was "[t]he fact that he hadn't chosen a minority to fill the Project Development Division Head position." Haddad then testified that when he proposed Dea's transfer to Hocevar he explained that it would "eliminate [the] potential for another confrontation over affirmative action." While the district court found, without explanation, that what it called Profilet's "after the fact statement" that the transfer was based on the Project Manager position was not credible, there is no evidence contradicting Profilet's testimony and Haddad's testimony corroborates it. While Hocevar's testimony suggested other reasons for the transfer, he did not testify that the reason for Dea's transfer was that Dea was late with his recommendation. Thus there is no evidence to support the district court's finding that Dea has failed to show causation and that holding of the district court is clearly erroneous.

D.

With his prima facie case established, Dea must show that the Commission's present contention on appeal that he was transferred because of his delay in filling the Division Head is pretext.[7] See *Beall*,

_____

[7]Pretext is not quite the correct word to use, but it is the best we can do in view of its use in the cases. By definition, the word means "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." *Webster's New Int'l Dictionary* 1797 (3d Ed. 1971). Thus, the word may have less than wholesome overtones.

130 F.3d at 619. Once an employer offers a non-retaliatory explana-tion for an adverse employment action, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination vel non." *Reeves*, 530 U.S. at 142-43 (internal quotations omitted). Then, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evi-dence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993)). We find that Dea has successfully shown the Commis-sion's explanation for his transfer is pretextual.

There is no evidence in the record supporting the Commission's argument on appeal or the district court's conclusion on this point. The Commission has conceded that it did not argue before the district court that delay was the reason for Dea's transfer. The district court reached that conclusion on its own. The Commission's attorney argued in his opening statement that Haddad and Profilet decided to transfer Dea because of the "potential for another conflict between Dr. Dea and the General Manager based on Dr. Dea's likely refusal to apply affirmative action in filling the Division Head position." Again, in closing argument, counsel for the Commission emphasized that Dea was transferred "to avoid this conflict [over affirmative action] and get on with the Commission's business, because Dr. Dea could not do his job, as Profilet put it, which was to select Miss Lucci . . . ." Before the district court, the Commission did not challenge the fact that Dea was transferred because of his position on affirmative action but instead argued that Dea's conduct was not protected opposition activity. When the district court noted to defense counsel that "[y]ou're suggesting that the Court resolve this case on [the grounds] either that it wasn't protected activity or that the manner of opposition was disorderly or disruptive and therefore not protected," counsel for

---

Neither Hocevar nor Profilet, however, gave lateness as the reason for Dea's transfer, and the Commission did not take that position in the dis-trict court, as we demonstrate. The district court's opinion giving lateness as the reason is sought to be justified in the brief filed here by the Com-mission, but that reason was not presented by the Commission to the dis-trict court.

the Commission conceded that those arguments had been "the essence of [its] defense." We have already explained why Dea's conduct is protected by the Opposition Clause of Title VII.

Dea testified that the reason Profilet gave him for the transfer was that he had not recommended a minority for the Division Head position. And Profilet, his supervisor, agreed. Furthermore, Dea sent two letters to Profilet and to the Commission protesting his transfer and arguing that the transfer was in retaliation for his opposition to the Commission's unlawful affirmative action policy. No one responded to Dea's letters by offering another reason for his transfer. While it is true that Profilet believed Dea was slow in making a recommendation for the vacant position and that he had urged Dea to get the position filled, Profilet did not testify that Dea's delay in making a recommendation was the basis for the decision to transfer Dea but that Dea was transferred because he refused to recommend Miss Lucci for the vacant Division Head position. Profilet testified that the notion to transfer Dea originated with Haddad, who first had discussed the matter with General Manager Hocevar and then suggested to Profilet that Dea be transferred because of his reluctance to fill the Division Head vacancy with a minority applicant.

Haddad corroborated Profilet's testimony, indicating that he suggested the transfer to General Manager Hocevar and, subsequently, to Profilet, in order to avoid a confrontation with Dea over the Commission's affirmative action policies. Hocevar did not contradict Haddad with respect to their meeting, he indicated only that he could not recall whether they had met or what they discussed. Even if Haddad thought that Dea was delaying a recommendation for the Division Head his concern when he went to Hocevar was that "Dea had a short list which did not include the candidate that [the Minority Affairs office] wanted." Haddad stated that his motive for recommending the transfer was to eliminate the potential for a confrontation with Dea over affirmative action.

Hocevar testified that he approved Dea's transfer because he was dissatisfied with some of the work product coming out of Dea's department. Hocevar did not testify, however, that he approved the transfer because of Dea's delay in making a recommendation for the vacant Division Head position.

We conclude, in light of corroborating testimony from Haddad and Dea and the lack of conflicting testimony, that the district court was clearly erroneous when it found that Dea was transferred because of delay in making a recommendation for the Division Head position. Dea has shown that the Commission's present suggestion that delay was the reason for the transfer is pretextual.

E.

The only question remaining is whether Dea was transferred as a result of his protected opposition conduct. Again, the relevant evidence is uncontroverted. Hocevar, the general manager, had to approve the transfer, which was recommended by Profilet.

Hocevar did not testify that he approved the transfer because of lateness or because of Dea's opposition to affirmative action policy, but because he "was not completely satisfied with things that were going on in Project Planning and Design." As just noted, neither affirmative action nor lateness were the reasons testified to by Hocevar. Profilet, on the other hand, testified that he made the recommendation to transfer Dea because Dea did not recommend Miss Lucci to fill the vacancy.

> Q:  Who made the recommendation to remove Stan Dea from the position as Director of the Bureau of Planning and Design?
>
> A.  Well, I did.
>
> Q:  And what was the decisive event that lead you to remove Dr. Dea from his Bureau of Directors (sic) position?
>
> A:  The fact that he hadn't chosen a minority to fill the project development position.

Haddad, the personnel man, and Profilet testified that Haddad had come to Profilet at the instance of Hocevar to effect the transfer of Dea on account of the affirmative action problem. But Hocevar testi-

fied that he did not remember the conversation with Haddad and that the first thing that he knew about the transfer was the recommendation from Profilet.

All of the above testimony serves, of course, to corroborate the testimony of Dea, who was told by Profilet he was being transferred because he would not recommend Miss Lucci to fill the vacancy. We have held in a case on facts so similar as to be indistinguishable that the testimony of Hocevar as to the reason for the transfer is "simply not probative." In *Rowe v. The Marley Co.*, 233 F.3d 825 (4th Cir. 2000), when a question arose as to whether or not a reduction in force was the cause of Rowe's discharge, rather than Rowe's age or disability, the testimony of one Garber, who was the decision maker, was held to control rather than the contrary testimony of Moore, Garber's supervisor, who had to approve the discharge. Here, Profilet's testimony, which corroborates Dea's, must be held to control over Hocevar's testimony. Profilet was the decision maker and Hocevar had merely to approve the transfer, so his testimony is "simply not probative." *Rowe*, 233 F.3d at 825. The rule is even more pronounced in this case because Hocevar did not remember the conversation with Haddad, which Haddad and Profilet both testified had initiated the problem on which this case is based.

Although the general rule requires an appellate court to remand for further findings when a factual issue has not been resolved below, "where a thorough review of the record permits only one resolution of the factual issue — i.e., where any other resolution by the district court would be clearly erroneous — the appellate court may make the appropriate finding in the first instance." *Patterson v. Greenwood School Dist.*, 696 F.2d 293, 295-96 (4th Cir. 1982) (finding that record was sufficiently clear to allow appellate court to rule in first instance that interviewing authorities would have chosen another female applicant over plaintiff even if she had not been subject to sex-based discrimination and thus that damages were not warranted). Under these circumstances, Dea's showing that the Commission's explanation for his transfer is pretextual, in combination with the evidence establishing his prima facie case of retaliation, warrants judgment in his favor. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). In fact, the record allows no other conclusion.

There is simply no evidence worthy of credit in this case that Dea was transferred for any other reason except the fact that he recommended Coe for the promotion rather than Miss Lucci, a less qualified applicant.

Finally, the Commission argues that Dea's claims are speculative and that his damage claims are moot. We are of opinion and find that Dea's damage claims are not moot but express no opinion as to whether or not they are speculative. That particular argument should first be made to the district court on remand.

Accordingly, the judgment of the district court is reversed. On remand the district court will enter judgment for Dea's estate and ascertain damages.

*REVERSED AND REMANDED WITH INSTRUCTIONS*