**Eileen M. HYLIND Plaintiff**

v.

**XEROX CORPORATION Defendant**

**No. CIV PJM 03–116.**

United States District Court, D. Maryland.

July 8, 2005.

Eileen M. Hylind, Pro Se, for Plaintiffs.

Robert Ross Niccolini, Esquire, Patrick Sheridan, Esquire, Baltimore, MD, for Defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

Eileen Hylind has two remaining causes of action in her Title VII employment discrimination suit against Xerox Corporation. One is for retaliation (Count III), the other for gender discrimination (Count IV).[1] Xerox has filed a Motion for Summary Judgment as to these remaining counts. The Court DENIES the Motion.

---

1. The Court previously granted Xerox's Motion to Dismiss claims of hostile work environment based on gender (Count I) and *quid pro quo* sexual harassment (Count II).

## II.

In its Opinion and Order of September 30, 2003, the Court laid out the factual predicate of the case.

For the present, it suffices to recall that after some 15 years as a salesperson for Xerox, Hylind took temporary, then permanent disability leave, claiming stress by reason of certain alleged discriminatory gender-related actions taken against her while on the job. Her claims of employment discrimination were filed with the Montgomery County [Maryland] Office of Human Rights (and cross-filed with the Equal Employment Opportunities Commission) in October 1995 but not finally resolved by the EEOC until October 17, 2002. The outcome was unfavorable for Hylind, who commenced the present lawsuit within 90 days of receiving of her Notice of Right to Sue letter from the EEOC.

## III.

In its earlier Opinion, the Court found that most of Hylind's allegations of gender discrimination were barred by limitations. Specifically, the Court held that any alleged discriminatory acts that occurred prior to December 31, 1994 were out of time. Nevertheless, with regard to Hylind's retaliation claim, the Court held that because at least one alleged retaliatory act occurred after December 31, 1994, to wit in January 1995, it would—if proven—remain timely. The same held true with regard to the alleged gender discrimination. Certain acts taken against Hylind based on her gender were alleged to have occurred after December 31, 1994, making that claim timely as well.

Xerox returns to Court seeking summary judgment on the remaining claims, arguing that laches prevents Hylind from going forward with them at this late date and, in any case, that there are no genuine issues of material fact with regard to the claims such that Xerox is entitled to judgment as a matter of law.

The Court will deal with relevant facts as it evaluates each of Xerox's arguments for granting it summary judgment.

## IV.

Summary judgment is appropriate if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). When a moving party supports its motion with affidavits and other appropriate materials, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the ... response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A mere scintilla of evidence supporting the case is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## V.

The Court accepts that laches may bar a Title VII action if there is unreasonable and unexcused delay in bringing the action and the defendant has been materially prejudiced as a result. *See e.g., EEOC v. Dresser Indus., Inc.*, 668 F.2d 1199, 1202–04 (11th Cir.1982); *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 857–58 (8th Cir.1978). Courts, however, are disinclined to penalize private plaintiffs who have simply waited for the EEOC (or its state counterpart) to act. *See e.g. Holsey v. Armour & Co.*, 743 F.2d 199, 211 (4th

Cir.1984) (laches not applicable since plaintiff's decision to await completion of administrative process was not inexcusable delay; action filed 4½ years after the charge), *cert. denied* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). Indeed, unless and until a claimant has exhausted her administrative remedies, this Court would lack jurisdiction to hear her case. *See* 42 U.S.C. § 2000e–16(c) (2000), 29 C.F.R. § 1614.407 (2004).

■ It is true that some courts have dismissed actions where the plaintiff has not made sufficient inquiry of the agency during the period of delay, *see e.g. Cleveland Newspaper Guild, Local 1 v. Plain Dealer Publishing Co.,* 839 F.2d 1147, 1154 (6th Cir.), *cert. denied* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 234 (1988). But in the present case there really can be no dispute that during the seven year administrative investigation undertaken by the Montgomery County Human Relations Commission, Hylind remained diligent in seeking a remedy despite her physical disability (migraine headaches). Among other things, she sought mediation, attempted recourse to Xerox's open door policy to engage the president of the corporation's U.S. operations and also contacted a subsequent chief executive officer to seek resolution of her claims.

The Court finds Xerox's claim of laches without merit.

## VI.

Section 704(a) of Title VII provides that "(i)t shall be unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this [title], ...." 42 U.S.C. § 2000e–3(a).

■ A *prima facie* claim of retaliation requires that an employee prove that (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir.1985). Where direct or indirect evidence is lacking, the employee may utilize the *McDonnell Douglas* framework to offer circumstantial evidence of retaliation. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989). Under *McDonnell Douglas,* the employee must first establish a *prima facie* case of retaliation, at which point the burden shifts to the employer to establish a legitimate non-retaliatory reason for its action. If the employer sets forth a legitimate non-retaliatory explanation, the employee must then show that the employer's proffered reasons are pretextual, otherwise her claim will fail. *Id.*

■ Although Xerox obviously takes a different view, the Court understands Hylind's claim of retaliation to be that she protested a gender-based limitation on her access to the Vitro/Tracor account (which occurred in July–August 1994) and in retaliation was taken off that account and reassigned to the less desirable Giant Food account, the reassignment occurring in January, which is within the applicable limitations period. The Court has already indicated that, if the act of retaliation occurred within limitations, it is actionable even if the protected activity Hylind engaged in occurred outside the limitations period. *See Nat'l. RR Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Accordingly, Hylind has to make a *prima facie* showing that she engaged in protected activity, that her removal from one sales account and reassignment to another constituted an adverse action, and that a causal connection existed between the protected activity and the adverse action.

■ The Court considers first whether Hylind's removal from the Vitro/Tracor ac-

count and reassignment to the Giant Food can be deemed to constitute "adverse action." "Adverse employment action" includes any retaliatory act if the act results in an adverse effect on the "terms, conditions, or benefits" of employment. *Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001). A truly significant change in job assignment will constitute an adverse employment action as previously defined. *Id.* at 868.

■ Xerox suggests that, at least in terms of revenue opportunities, Hylind's reassignment represented no change in the terms and conditions of her employment. Indeed, it says that in her new territory it was easier for Hylind to "hit quota" and to obtain additional compensation with respect to existing contracts as opposed to selling new customers.[2]

Hylind contends that she had handled the Vitro/Tracor account for 4½ years, working uncompensated hours, building relationships with the customer and obtaining knowledge necessary to earn substantial commissions when the customer's next buying cycle would occur.[3]

Although Xerox denies that Vitro/Tracor was on the verge of a substantial order when Hylind "at her request was taken off the account," Hylind vigorously disputes both assertions. She denies that she ever asked to be taken off the account. Beyond that, she submits that a substantial order from Vitro/Tracor was likely in 1995 for a number of reasons, namely because (1) five year contracts from an earlier record-breaking order were expiring; (2) she had identified an additional opportunity for 1,300 low-end desktop laser printer replacements and 500 opportunities for new placements; (3) Vitro/Tracor had a separate fleet of aging copier equipment that needed replacement; (4) the low-end copiers in the Vitro/Tracor fleet from the 1990 order were approaching their 5 year end of life period; (5) the customer was motivated to replace the old equipment; (6) Vitro/Tracor had no national account manager such that Hylind's experiences with local decisionmakers would give her particular influence in their purchase orders; (7) Tracor's credit had been re-established after a bankruptcy proceeding so that a large order in 1995 was possible; (8) Xerox had "sole vendor status" with Vitro/Tracor; and (9) in August 1994 Xerox had launched a new pricing plan that would be particularly attractive to a Government contractor such as Vitro/Tracor.

Hylind, in short, contends that when Xerox discharged her from the Vitro/Tracor account, a substantial order was expected from it. In consequence, she says, a jury could reasonably conclude that she lost earnings in at least the amount over salary that she had earned 5 years earlier when she originally won the Vitro/Tracor business for Xerox, *i.e.* some $65,000 above salary in the year of the original order. Alternatively, she suggests that a jury could conclude that at a minimum she would have received the same premium over salary that the sales representative who took over the Vitro/Tracor account in 1995 actually obtained, some $23,000.

If this were not enough, Hylind argues further that her reassignment to the Giant

---

**2.** The Court notes, however, that Hylind only remained with Xerox until June of 1995, so that she never completed a full year of service on the Giant account.

**3.** Hylind has submitted a statement from the Purchasing Manager for Vitro/Tracor to the effect that, between 1990 and 1994 when he worked with her, he always "found her to be professional and ethical * * * I know that she worked very long hours. She learned our processes. She became well respected and established credibility with many Vitro managers and employees."

Food account caused a loss of income. Xerox (albeit with minimal substantiation) has characterized the Giant Food account as one with "enormous potential," a "solid account in 1995." Hylind, however, is prepared to demonstrate that Xerox lost a substantial bid in 1994 with Giant Food, at which point the account became a liability. Copier opportunity was essentially frozen for 3 to 5 years until the competitor's contract expired. Even Xerox, says Hylind, concedes that eventually the account became a liability.

The Court is satisfied that genuine issues of material fact exist with regard to whether Xerox's taking away of the Vitro/Tracor account, considered either independently of or together with her reassignment to the Giant Food account, constituted an adverse employment action for purposes of retaliation.

To what extent, then, did Hylind engage in protected activity prior to mid-January, 1995, when she was taken off the Vitro/Tracor account? While Xerox appears to dispute that she had done so, record evidence clearly suggests that Hylind had in fact engaged in such activity. She relates that during an account review at the end of July 1994, her supervisor Toby Tobin suggested that it appeared she would be getting an enormous order from Vitro/Tracor for 1995 because she was "sleeping with" the customer's account executive Gary Pool.[4] Hylind responded that she had never slept with the man and that she was getting the company's business despite the fact that she had rejected a romantic relationship with him two years earlier. Indeed Hylind relates that her relationship with Pool had only lasted between June and July of 1992, two full years prior to Tobin's raising the issue. By way of background, Hylind explains

that in a discussion about the Vitro/Tracor account with her then manager Jenny Bennett in 1992, Bennett told her that a sexual relationship would be "good for business" and that Bennett had responded "yes" when Hylind asked her if Bennett expected her to "have sex" with a customer. When Hylind asked what would happen if she made the customer angry by rejecting him, Bennett allegedly responded, "We'll just take you off the account." However, Bennett allegedly said Hylind would never be taken off the account as long as the customer was interested in her. Two years later, in July of 1994, presumably upon hearing (or remembering) that Hylind had rejected Pool, Tobin announced that he was going to have a talk with Pool to discuss his failed relationship with Hylind in order to assess how Pool felt about being rejected by Hylind. Hylind says she protested, telling Tobin she opposed such a meeting, telling him it was demeaning and would undermine her authority in her most important account. Tobin nevertheless did talk to Pool and apparently concluded that he was indeed uncomfortable with Hylind because of the rejection.

Hylind says that on August 9, 1994, Tobin therefore "ordered" her to have no further contact with Pool, who was an essential contact in the Vitro/Tracor account (though Tobin did not at that time tell Hylind she was otherwise off the account). Tobin said this, according to Hylind, despite the fact that he admitted that Pool had told him Hylind was "the best rep they ever had." Hylind complained to Tobin that what he had done to her was outrageous and requested that he revisit the customer and correct his mistake. Tobin never did so. Instead, in mid-January 1995, Tobin removed Hylind from the Vitro/Tracor account.

---

4. As Hylind relates it, Tobin said, "You're sleeping with that guy, right?" Tobin denies that there ever was a discussion about whether Hylind was sleeping with Pool.

To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). Opposition activity encompasses voicing one's opinions in order to bring attention to an employer's discriminatory activities. *See id.* Assuming Hylind's testimony is believed, the Court finds it fairly debatable that her protest with respect to Tobin's motivation in visiting Pool constituted a complaint about illegal gender discrimination, which is to say, protected activity. Customer preference as to the gender of a company's employees is not ordinarily considered a *bona fide* occupational qualification (BFOQ). *Cf. Diaz v. Pan American World Airways*, 442 F.2d 385, 389 (5th Cir.1971) *cert. denied* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971) (noting that the EEOC guidelines state that a BFOQ ought not be based on "the refusal to hire an individual because of the preferences of 'customers' "). Even if Xerox did not actually violate Title VII, the evidence nonetheless suggests that Hylind, in reasonable good faith, was protesting Xerox's action based on what she thought was illegal gender discrimination. And this belief was objectively reasonable under the circumstances. That is all that is required for a finding of protected activity.[5]

Finally as to causation, the Court indicated in its earlier Opinion that proximity in time between the protected activity and the adverse employment may suffice to demonstrate a causal connection for purposes of a Title VII retaliation claim. *See Settle v. Baltimore County*, 34 F.Supp.2d 969, 1000 (D.Md.1999). The Court finds the lapse of time between the late July-early August 1994 encounter between Hylind and Tobin, the Tobin–Pool meeting, and Tobin's removal of Hylind from the Vitro/Tracor account and reassignment to the Giant Food account in January 1995 to be fairly proximate. More important, the fact that Hylind's arguably protected activity involved the very Vitro/Tracor account that was subsequently taken from her is enough to raise a genuine dispute of material fact on the issue of causation.

Xerox makes a final thrust. It submits that it had a legitimate non-discriminatory reason for taking Hylind off the Vitro/Tracor and putting her into the Giant account which she cannot demonstrate was pretextual. Specifically, says Xerox, with the retirement of one of its salespersons, it was convenient to collapse 3 sales territories into 2 more productive ones. The trier of fact may or may not find this proposition persuasive. The Court, however, is satisfied at this juncture that Hylind's evidence of causation in and of itself is arguably forceful enough to overcome Xerox's proffered reason for taking her off the Vitro/Tracor account.[6]

---

**5.** A Title VII plaintiff bringing a claim for retaliation need not establish that the employment practice she opposed in fact violated Title VII. *See Ross*, 759 F.2d at 357 n. 1. At a minimum, however, a plaintiff bringing a claim for retaliation must have held a reasonable, good faith belief that the employment practice she opposed was violative of Title VII. *See Bigge v. Albertsons*, 894 F.2d 1497, 1503 (11th Cir.1990) (finding that plaintiff must "prove that he opposed an unlawful employment practice which he reasonably believed was occurring"). This belief must be objectively reasonable in light of the facts and record presented. *Id.*

**6.** According to a former Xerox support staff member, George Carrick, "It was definitely unfair for [Hylind] to lose [the Vitro/Tracor] business in 1995. She had earned the right to cash in on her hard work. I know she had put in years when Vitro/Tracor wasn't buying where she couldn't even make her quota."

In sum, insofar as Hylind's removal from the Vitro/Tractor account and/or her reassignment to the Giant Food account is concerned, Xerox' Motion for Summary Judgment is DENIED.

One aspect of Count III remains.

■ In it, Hylind also alleges that she was "demoted and passed over for 23 promotions or reinstatements" in retaliation for engaging in protected activities. This claim has not been addressed in detail by either party. Hylind apparently stated on deposition that she was not allowed to be promoted by her supervisor, Toby Tobin, after he "gerrymanded" her sales territory for 1995, but she does not specify what positions she sought and was not promoted to in that time frame (bearing in mind that only promotions denied after December 31, 1994, would be within the limitations period). Xerox submits that there is evidence which establishes that all available positions were posted in the main Xerox office, to which Hylind had easy access, and that she was free at any time to apply for any position without the assistance from Tobin. In short, says Xerox, Hylind cannot show that she was rejected for a specific position under circumstances giving rise to an unlawful retaliation. *See Amirmokri v. Baltimore Gas & Electric Co.,* 60 F.3d 1126, 1129–32 (4th Cir.1995).

Hylind does state that 3 opportunities existed in her district in 1995 for her reinstatement and that other positions existed as well. But because she feels that this cause of action falls under other causes of action, she has deferred discussion of the matter in her opposition to the Motion for Summary Judgment.

This, however, is a Motion for Summary Judgment. The future, as the saying goes, is now. A plaintiff cannot rest merely on assertions in her complaint, but must through affidavits, admissions, evidence obtained through discovery or otherwise set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) Similarly, the burden is upon her to establish a *prima facie* case. *Id.* at 322, 106 S.Ct. 2548. In respect of alleged retaliatory denials of promotion, Hylind has not done this.

Therefore, as to any separate action of retaliation based on non-promotion or failure to be reinstated for engaging in protected activity, Xerox's Motion for Summary Judgment will be GRANTED.

## VII.

In Count IV of her Complaint, Hylind alleges that Xerox practiced gender discrimination when it assigned her "to a customer because she was a woman and because her supervisor determined the customer was attracted to her ... in order to keep the customer placated and entertained while the account was doing business with another vendor." This count survived Xerox's Motion to Dismiss; Xerox now asks for summary judgment with respect to it.

Hylind alleges *inter alia* that at the end of October 1994 she and Tobin, her supervisor, met for the first time with Art Koch, a Giant Food employee responsible for the Xerox account. Hylind says that Koch and Tobin joked about Koch's preference for being solicited by women and Koch stated that he was "allowed to have a preference" and it was "up to the vendor whether or not they catered to it." The two men, she says, laughed about how Koch "just wouldn't return the men's phone calls."

In the meeting, Tobin supposedly brought up the subject of Koch's "hobby," at which point, at Tobin's urging, Koch apparently retrieved from the trunk of his car 15 to 20 photographs of women naked from the waist up, which he then showed

to Hylind and Tobin. According to Hylind, Koch remarked that he would gladly use "anyone, any time" as a model, eyeing Hylind, then gave her a card featuring one of his photographs as an invitation to attend a show involving various depictions of the same nude model. Koch suggested that perhaps he might see Hylind later that evening when he went to retrieve his work. On deposition, Tobin conceded that Koch or possibly Tobin himself did bring up the subject of "abstract photography."

After departing the meeting with Koch, Tobin raised with Hylind the possibility of adding the Giant Food account to her territory for 1995. Hylind states that she emphatically told Tobin she did not want the account, whereas Tobin told her that Koch "liked dealing with women," was "like a dirty old man" and "had sent body oils" to the last Xerox female representative, Melissa Freeman. Tobin allegedly remarked upon the age difference between Koch and Freeman, exclaiming "and she's a married woman!" Tobin purportedly told Hylind that having a female sales representative was "the only way Xerox had gotten business in the past" and that Hylind would be his choice because he only had 3 women on his team, one of whom Koch would "not be attracted to" and the other whom "he wouldn't do that to . . . she was too young and nice." Tobin allegedly stated that Koch "really liked" Hylind and because of that Tobin was inclined to assign her the Giant Food account.

Hylind says she insisted that assigning her the Giant account would be sexual harassment and that she did not want to be "pimped out." Tobin then supposedly replied, "Here you go again," telling Hylind she was "like a scorpion," "like a viper with all her charges of sexual harassment" "[against] people at Xerox." Tobin also allegedly told her she was "like a bad apple" and that "Xerox doesn't need people like you around." Later that same day, according to Hylind, after discussing "Montgomery County law" with Tobin, he told her he could "beat any charge" of sexual harassment just by "collapsing her territory and giving her the territory number Giant Food had been assigned to." That way, Tobin purportedly said, Hylind couldn't "prove anything."

For his part, Tobin contends that Hylind was never offended by Koch's photographs, that she and Tobin did not discuss the photographs after leaving the meeting with Koch, and that while they did discuss Koch's demeanor, Hylind never objected to the possibility of the Giant Food assignment and never indicated that she felt she would be subjected to sexual harassment.

Hylind, however, continues:

Immediately upon arriving back in her office from the meeting with Koch, she sought out Melissa Freeman, who confirmed that Koch had indeed sent her body oils, and who said that she did not think Koch was "all talk and no action." Koch's intentions, according to Freeman, were serious. Freeman also indicated that Koch had been "sexually explicit," and said she was not comfortable repeating what he had said to her, especially in mixed company. Finally, Freeman supposedly indicated that she had asked Tobin that she be taken off the Giant account because she was uncomfortable with Koch, and that Tobin had complied with her request.

Notwithstanding the foregoing, on or about January 18, 1995, Tobin informed Hylind that her territory had been changed and that the Giant Food account had been assigned to her for 1995.

Obviously a genuine dispute of fact exists as to these events. The question is whether the facts are material to a cause of action for sexual discrimination so as to defeat Xerox's Motion for Summary Judgment on that count.

Xerox argues that Hylind's allegations relating to the meeting between her, Tobin and Koch, even if they constitute a cause of action for sexual harassment, occurred before December 31, 1994, *i.e.* outside the limitations period. Further, says Xerox, what Hylind is complaining about is sexual harassment, not gender discrimination, and the Court has already ruled sexual harassment out of the case. Xerox emphasizes that Hylind has not alleged that Koch or anyone associated with Giant Food ever engaged in any conduct in 1995 that might arguably constitute sexual harassment.

The Court agrees that any independent action for sexual harassment for acts that occurred outside the limitations period is barred.

On the other hand, there is another view of the facts and that is what the Court understands Hylind to be taking. What she suggests is, that in January 1995, despite her protests, Xerox assigned her the Giant Food account precisely because she was a woman and that it did so solely in order to suit the gender preference of a key contact at that account, knowing moreover that that contact was at least arguably a sexual harasser who was very likely to subject Hylind to harassing behavior.

■ On this view of the facts, has a *prima facie* claim of gender discrimination been stated?

The Court believes it has. First, assuming everything Tobin is supposed to have said to Hylind when considering re-assigning her to the Giant Food account is believed, Xerox would be making Hylind's gender a condition of her employment. Only females would be assignable to the Giant Food account. But gender is hardly a BFOQ for an office equipment salesperson, *Cf. Diaz*, 442 F.2d at 389 (female gender for flight attendants not a BFOQ), so if Hylind was assigned to Giant Food on that basis, the action would clearly be discriminatory. And while more typically it might be a male salesperson denied access to a desirable account reserved for females who would complain, there is nothing illogical about a female salesperson placed in an undesirable account reserved for females doing so. *Cf. Jones v. ITT Educational Services*, 587 F.Supp. 1533, 1538–39 (E.D.Mo.1984) (holding evidence that female sales representative was assigned to less desirable secretarial position because she was female established *prima facie* case of discriminatory job assignment). Gender discrimination is gender discrimination whoever chooses to blow the whistle.

■ But there is more. Courts have held that, as a rule, *customer preference* for dealing with members of one sex as opposed to another does not constitute a valid basis for establishing sex as a BFOQ, at least in the absence of evidence that failure to honor customer preference would mean the employer could not provide the primary service it offers. If preference for female flight attendants is not a BFOQ because the essence of the airline business would be not undermined by not hiring them, *Diaz*, 442 F.2d at 389, then preference for female salespersons of office equipment can hardly qualify. Whatever the gender predilection of Koch of Giant Food might have been, it can hardly have had anything to do with the essence of Xerox's office copier business.

Again, although more typically a male salesperson denied access to a desirable account reserved for females might be the one to complain, a female assigned to a less desirable account by reason of her sex can just as plausibly cry foul. *Jones*, 587 F.Supp. at 1538–39.

■ Finally, it is clear that a employer can be liable for a customer's unwarranted sexual advances if the employer ratifies or acquiesces in the customer's demands. *Rodriguez–Hernandez v. Mi-*

*randa–Velez,* 132 F.3d 848, 854 (1st Cir. 1998). Liability for sexual harassment by customers can be premised on either of two theories—*quid pro quo* or hostile work environment. *Id.* A *quid pro quo* claim is stated where continued employment is conditioned on coerced sex, a condition inherently linked to gender. *Id.* Moreover, if an employer should reasonably anticipate that a plaintiff may become a victim, but fails to take action reasonably calculated to prevent the harassment, liability may be imposed. As the Fourth Circuit stated in *Paroline v. Unisys Corp.,* 879 F.2d 100, 106 (4th Cir.1989), the law "impose[s] the duty on [the employer] to take adequate steps to try to prevent ... harassment, not merely to act after the event." The court noted that an "employer's knowledge that a male worker had previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct." 879 F.2d at 107.

It is true that Hylind alleges no actual sexual harassment occurring at Giant during 1995. On the other hand, she only remained there until June of that year when she went out on disability, arguably, at least in part, as a result of her anxiety over being placed on the Giant account in the first place. By the same token, there is no evidence that Xerox, despite its alleged knowledge of Koch's predisposition, ever took any action to prevent possible harassment of Hylind, including issuing words of caution to Koch.

Beyond this, it is at least arguable that Hylind's earning opportunities at Giant (as opposed to her opportunities with the Vitro/Tracor account) decreased as a result of her being placed at Giant.

Xerox argues that the Court granted its Motion to Dismiss as to a sexual harass-

ment claim earlier in this case and there is no disputing that it did. But the *quid pro quo* harassment that the Court dismissed at that point was a separate action for any sexual harassment that might have occurred prior to December 31, 1994. This meant that the encounter between Hylind, Tobin, and Koch that took place in July–August 2004 in and of itself would not be actionable. But it was not until January 1995 that Tobin actually relegated Hylind to the Giant Food account, arguably putting her, so to speak, in harm's way. That was when, according to Hylind, given Koch's purported history with Melissa Freeman and given his initial encounter with Hylind and Tobin, Xerox should have reasonably anticipated that she might become a victim. And that action occurred within the limitations period.

While Hylind's Count IV is styled as "sex discrimination,", it unequivocally does say that "Defendant acted illegally by assigning the plaintiff to a customer because she was a woman and because her supervisor determined the customer was attracted to her." While Hylind goes on to allege what may also be a claim of sexually hostile environment, as the Court has noted, a claim of sexual harassment can comprehend two theories—one being hostile environment, the other *quid pro quo*. Making allowances, as it must, for the fact that Hylind is proceeding *pro se, see e.g. U.S. v. Garcia,* 65 F.3d 17, 19 (4th Cir.1995), the Court is not inclined to turn away her claim of *quid pro quo* sexual harassment insofar as her assignment to the Giant account is concerned merely because she styled it Count IV "sex discrimination" or even sexually hostile environment. As the First Circuit reminds in *Rodriguez–Hernandez,* "sexual harassment is an unlawful form of sex discrimination," 132 F.3d at 854.

For all the reasons stated above, the Court finds that, in Count V of her Com-

plaint, Hylind has established a *prima facie* case of sexual discrimination.

While Xerox may wish to argue that it had a legitimate non-discriminatory reason for reassigning Hylind to the Giant account, her version of how the reassignment came about remains sufficiently compelling that it could lead a trier of fact to conclude that Xerox's reasons were merely pretext for what would otherwise be illegal discrimination based upon gender.[7]

Except in the limited particular mentioned herein, Xerox's Motion for Summary Judgment as to Hylind's sexual discrimination claim is DENIED.

A separate Order will issue.

### ORDER

Upon consideration of Defendant Xerox's Motion for Summary Judgment [Paper No. 104] and Plaintiff Eileen M. Hylind's Opposition thereto, it is for the reasons stated in the accompanying Opinion, this 7 day of July, 2005

**ORDERED:**

1) Defendant Xerox's Motion for Summary Judgment [Paper No. 104] is **GRANTED IN PART** and **DENIED IN PART**;

2) It is **GRANTED** as to any claims relating to failure to promote or failure to reinstate under Title VII;

3) In all other respects, the Motion is **DENIED**;

4) An In–Chambers Pre–Trial Conference shall be **HELD** in this case on Thursday, **October 27, 2005 at 4:45 p.m.**

---

7. Indeed, evidence of Hylind's long history of complaints about her sexual harassment at Xerox would seem to be relevant not only to show that in fact she asked not to be assigned the Giant Food account, but to show as well that the reassignment may have been intended to vex her precisely because of her past complaints.